**Johnny L. BANKS, Plaintiff–Appellant,**

v.

**BETHLEHEM STEEL CORPORATION, a corporation; Seattle Steel, Inc., a corporation; United Steelworkers of America, a labor organization, Defendants–Appellees.**

No. 87–4028.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1988.

Decided March 20, 1989.

---

Abraham A. Arditi, Seattle, Wash., for plaintiff-appellant.

James R. Dickens and Cathy L. Parker, Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S., Seattle, Wash., and Richard Brean, for defendants-appellees.

Before WRIGHT, WALLACE and HUG, Circuit Judges.

HUG, Circuit Judge:

This case arises out of the controversy surrounding Bethlehem Steel's dismissal of Johnny Banks ("Banks") for fighting. Banks claims that his union, United Steelworkers of America ("the Union" or "the International"), breached its duty of fair representation by failing adequately to pursue his grievance. Banks further alleges that his discharge by Bethlehem was racially motivated. The district court granted the Union's motion for summary judgment on the fair representation claim. After a full bench trial, a magistrate likewise dismissed all claims based on allegations of racial discrimination. We affirm in part, reverse in part, and remand.

## I.

## BACKGROUND

Johnny Banks was a steel mill worker employed by Bethlehem Steel Corporation ("Bethlehem" or "Bethlehem Steel") in its Seattle plant. Before the incident that led to his discharge, Banks had an unblemished employment record reflecting twelve years of exemplary service at Bethlehem. The assistant supervisor of mills rated him in the top 10 percent of all hourly employees. Further, Banks had accumulated the second highest number of overtime hours in his department and had only missed approximately five days in his last five years with the company. He was, in fact, slated to receive the first available foreman position in the 12″–10″ mill, one of three rolling steel mills in Bethlehem's Seattle complex. This promotion would have made him the first black employee to hold a foreman position in that mill.

During three of the four days immediately preceding the altercation that precipitated his discharge, Banks worked double, 20–hour shifts. After logging a total of 70 hours in four days, Banks arrived home in the early morning on July 27, 1984, only to be called back almost immediately for another double shift that was scheduled to begin at 5:00 a.m. At first, Banks declined because he was simply too tired. But when Bethlehem called again at 10:00 a.m.,

claiming that no other employee would work the extra shift, Banks agreed to return to the mill.

The 12″–10″ mill reached temperatures of over 130 degrees in the summertime. Because Banks worked in proximity to hot steel, he had to wear several pairs of pants to keep from being burned. Under the terms of its collective bargaining agreement with the Union, Bethlehem was to ensure adequate ventilation in the mill. It did not, however, provide fans at every work station. Rather, workers apparently moved the fans from station to station as the need arose.

When Banks arrived at work on July 27, there was insufficient ventilation in his work area. He therefore decided to move a fan from a nearby work station. Although there is conflicting evidence as to whether the fan Banks decided to appropriate was in use, Banks claims that it was not even plugged into an outlet. Because the fan was large and unwieldy, Banks called an overhead crane to help with the move. As he was hooking a chain to the fan, James Davis ("Davis"), who apparently felt the fan was his, grabbed the chain in an attempt to stop the fan's relocation. Once again, the facts are in dispute. Banks may have pushed Davis or he may simply have let go of the chain after a short tugging match, causing Davis to stumble backwards. Regardless, the evidence is clear that Davis, a former boxer, retaliated by punching Banks so hard that he fell to the ground unconscious. The wound Banks received to his forehead required 32 stitches to close.

Under a Bethlehem policy against fighting, both Banks and Davis were automatically suspended with intent to discharge. The Union filed grievances on behalf of the two men and represented them throughout the grievance process. In preparation for Banks' discharge hearing, Warren Dorcas, then president of the local union and co-chair of its grievance committee, interviewed Banks and Davis. Both men admitted the fight, but each blamed the other for its escalation.

Dorcas represented Banks at his discharge hearing on August 16, arguing that Banks had been a good employee, that the incident was more a shoving match than a fight, and that Bethlehem was responsible for appropriate placement of the fans. Unmoved by Dorcas' arguments, Bethlehem rejected the Union's position and refused to reinstate Banks. With the help of Robert Cooper, local treasurer and Dorcas' fellow chairman on the grievance committee, Dorcas then carried Banks' complaint to a "step 3 hearing" held on September 4, 1984. At this hearing, Cooper and Dorcas reiterated many of the arguments previously asserted by Dorcas, but Bethlehem remained obdurate. A step 4 meeting was subsequently held in which Tom Hughes, a staff representative for the International, appeared on Banks' behalf. Although this meeting too ended in impasse, Hughes eventually engineered a settlement for Banks, agreeing to drop the dispute short of arbitration for $3,000 and a change of Banks' termination status from discharge to "voluntary quit." Hughes obtained an identical settlement for James Davis.

█ Vehemently objecting to the terms of the settlement obtained by Hughes, Banks brought this action against the Union, Bethlehem Steel, and Seattle Steel.[1] Banks claimed that the Union breached its duty of fair representation in handling his grievance. He further alleged that Bethlehem discharged him without just cause in violation of the terms of its collective bargaining agreement, and that his dismissal was motivated by racial animus in violation of Title VII, 42 U.S.C. §§ 2000e to 2000e–17 (1982), 42 U.S.C. § 1981 (1982), and Wash. Rev.Code ch. 49.60 (1962 & Supp.1989). The district court granted summary judgment to the Union on the fair representation claim, and the remaining parties proceeded to trial before a magistrate. The magistrate entered judgment for Bethle-

---

1. After the events with which this appeal is concerned, Bethlehem Steel Corporation was purchased by Seattle Steel. Banks has joined Seattle Steel as a successor employer in order to ensure the availability of full relief should he win a reinstatement order from the court. We express no opinion on the availability of successor liability in this case.

hem Steel and Seattle Steel on the race discrimination claims. The issue of whether Bethlehem Steel had just cause to terminate Banks' employment was not before the magistrate because of the earlier summary judgment on the claim against the Union for breach of its duty of fair representation. An employee subject to a collective bargaining agreement who makes his or her union the exclusive bargaining agent must prove that the union breached its duty of fair representation before a claim against the employer can be established. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570-72, 96 S.Ct. 1048, 1059-60, 47 L.Ed.2d 231 (1976).

The district court directed the entry of a single judgment covering all claims. The judgment was entered, and Banks timely appealed. This court has jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

## II.

### MOTION FOR SUMMARY JUDGMENT

#### A. *Standard of Review*

We review *de novo* the granting of a motion for summary judgment. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 629-30 (9th Cir.1987). The appellate court's review is governed by the same standard used by the trial court. *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). Thus, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986); *see also* Fed.R.Civ. P. 56(c).

#### B. *Duty of Fair Representation*

Because labor unions operate as the exclusive voice for their membership, the courts have imposed upon them a duty of fair representation, calculated to ensure that the individual rights of their members are not unduly sacrificed in the pursuit of group goals. The Supreme Court has re-

cently reiterated the purpose and scope of this duty, stating:

> The duty of fair representation exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

*DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n. 14, 76 L.Ed.2d 476 (1983) (quoting *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967)) (other citations omitted); *see also Peterson v. Kennedy,* 771 F.2d 1244, 1253 (9th Cir. 1985) (quoting *DelCostello*), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

While recognizing the importance of a union's duty of fair representation, the Supreme Court simultaneously has acknowledged that unions must be given broad discretion to act in what they believe is their members' best interests. *Johnson v. United States Postal Serv.,* 756 F.2d 1461, 1465 (9th Cir.1985); *see also Ford Motor Co. v. Huffman,* 345 U.S. 330, 337-38, 73 S.Ct. 681, 685-86, 97 L.Ed. 1048 (1953). Thus, the unfair representation doctrine has been narrowly construed and a union will be found to have breached its duty of fair representation "only when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916 (citations omitted).

Banks does not allege in this appeal that the Union acted in a discriminatory fashion when processing his grievance. Thus, to succeed under his fair representation claim,

he must raise a genuine issue of material fact indicating that the Union's conduct was either arbitrary or in bad faith. To support his contention that the Union's handling of his grievance was both arbitrary and in bad faith, Banks points to the following circumstances: (1) because he believed that the International constitution prohibited the use of Union members as witnesses when their testimony would harm another employee, Warren Dorcas failed adequately to utilize the observations of Banks' fellow employees in Banks' defense; (2) as a staff representative for the International, Tom Hughes accepted Bethlehem's settlement offer against the express recommendation of local president, Warren Dorcas; (3) Hughes rebuffed offers of assistance from Banks' attorney; (4) Hughes allegedly had an ulterior motive for settling Banks' case in that he was changing jobs and wanted to close as many files as possible before he left; (5) the settlement was such that Hughes could not possibly have believed it to be in Banks' best interests; and (6) in determining that the Banks grievance was unwinnable, Hughes mistakenly relied on the statement of Mary Nelson that Banks was the aggressor, testimony that Banks argues would not have been admissible at arbitration. Through these numerous allegations, Banks is, in effect, challenging two distinct Union actions; Dorcas' handling of Union-member witnesses and Hughes' decision not to arbitrate. We will address each contention in turn.

### 1. Arbitrary Conduct

■ We first examine Dorcas' witness policy. According to Dorcas, the International constitution's admonition that one Union member should never "knowingly wrong" another prohibits the calling of Union-member witnesses in grievance proceedings if their testimony would be harmful to a fellow member. Since both Banks and Davis belonged to the Union, any testimony favorable to one would necessarily do damage to the other's position. Thus, when preparing Banks' case for review, Dorcas did not even inquire whether any witnesses

were available: He knew he would not use them.

Banks contends that Dorcas' witness policy concerning fellow Union members constitutes an arbitrary procedural decision that resulted in the failure to obtain the testimony of witnesses who could have assisted in his defense. Banks has produced evidence that a Union employee, Stan Maciolek, was available and willing to testify that the fan at issue was not in use and that Banks did not hit Davis or provoke the incident in any way. Thus, Banks argues, his case was seriously prejudiced by Dorcas' arbitrary failure to explore the use of Union-member witnesses such as Maciolek.

In *Peterson v. Kennedy*, 771 F.2d 1244 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), we attempted to synthesize our prior case law finding a breach of the duty of fair representation based upon a union's arbitrary conduct. After noting that "[w]hether in a particular case a union's conduct is ... so egregious as to be 'arbitrary', and hence sufficient to give rise to a breach of duty claim, is a question that is not always easily answered," *id.* at 1253, we concluded:

> There are some significant general principles that emerge from our previous decisions. In all cases in which we found a breach of the duty of fair representation based on a union's arbitrary conduct, it is clear that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct.

*Id.* at 1254. We then cited several examples of union conduct that satisfied this test and could therefore be deemed arbitrary.

One such example was discussed in *Gregg v. Chauffeurs, Teamsters & Helpers Union Local 150*, 699 F.2d 1015 (9th Cir.1983). In *Gregg*, the union filed grievances on behalf of a group of terminated employees. Later, however, it withdrew the grievances of certain employees based upon the union attorney's opinion that pursuing those employees' grievances weak-

ened other members' positions before the arbitrator. *Id.* at 1016. In discussing the merits of the abandoned employees' subsequent fair representation claim, we first commented that "[i]n determining whether the union's decision was arbitrary, the merits of the grievance and its importance to the employee are relevant to the sufficiency of the union's representation. The more important and meritorious the grievance, the more substantial the reason must be to justify abandoning it." *Id.* (citation omitted). We then concluded that the district court was correct in finding that the union's reason for withdrawing the grievances could not survive scrutiny. Importantly, in making this determination, we stressed the fact that the employees' claims were never considered individually, even though the factual and legal differences among them were significant. *Id.*

Another union action that we classified in *Peterson* as a procedural or ministerial failing rising to the level of arbitrary conduct was the subject of *Tenorio v. N.L.R.B.*, 680 F.2d 598 (9th Cir.1982). In *Tenorio*, we found arbitrary the union's decision not to interview two employees in order to obtain their explanation of the events that resulted in their discharge. While recognizing that the "thoroughness with which unions must investigate grievances ... varies with the circumstances of each case," *id.* at 601, we held that in order to comply with its duty of fair representation "a union must conduct some minimal investigation of grievances brought to its attention," *id.* (citations omitted). We went on to find that the union's investigation in the case "was so grossly inadequate as to *transcend ... poor judgment.*" *Id.* (emphasis added). In reaching this conclusion, we emphasized that we were not second-guessing the union's assessment of the grievance's merits. *Id.* at 602. Rather, our holding was based upon the ground that "the duty of fair representation requires that, *before* assessing the merits of a grievance, a union must have an ample basis upon which to make such an assessment." *Id.* (emphasis added).

As our discussion of *Gregg* and *Tenorio* makes clear, the line separating "procedural and ministerial" actions from those that require "an exercise of judgment" is, at times, indistinct. Certainly, the union in *Gregg* was making some sort of decision when it concluded that dropping a portion of its members' claims was warranted. Likewise, *Tenorio* involved a union's decision that interviewing employees to obtain their version of events before discharging them was unnecessary. Yet, under our rationale in *Peterson,* neither of these union decisions was an exercise of "judgment" and therefore immune from judicial review. Instead, both constituted procedural defects in the union's grievance process capable of supporting a fair representation claim. We can only conclude that the conduct at issue in *Gregg* and *Tenorio* constituted arbitrary union behavior because, in each instance, it placed the union in a situation where it either could not or would not make an informed judgment regarding the merits of individual claims.

Viewed in this light, *Gregg* and *Tenorio* control the resolution of the instant controversy. Indeed, Dorcas' decision not to interview or call as witnesses any Union employees is quite similar to the decision that we condemned in *Tenorio* as arbitrary: both ensured that no fair judgment of the validity of the grievants' underlying claims could be made. Further, we note that in this case, as in *Tenorio*, the Union's failing must be considered particularly egregious because it resulted in the grieving employee's discharge. *See id.* (union must exercise "special care" in handling grievances at issue because they involved discharge, "the most serious sanction an employer can impose" (citation omitted)). Finally, given our determination that a fundamental flaw marred the Union's grievance process, it makes little difference that Dorcas instituted his witness policy in the belief that it would further overall Union harmony. In their role as employees' exclusive representatives, unions must be careful to protect the interests of *all* those whom they represent: The needs of the many do not always outweigh the needs of the few, or the one. *See id.* (citing *Vaca,* 386 U.S. at 177, 87 S.Ct. at 909); *Huffman,* 345 U.S. at

337, 73 S.Ct. at 685; *see also Local 13, Int'l Longshoremen's & Warehousemen's Union v. Pacific Maritime Ass'n*, 441 F.2d 1061, 1067–68 (9th Cir.1971) ("the deliberate sacrifice of a particular employee as consideration for other objectives must be a concession the union cannot make" (footnote omitted)), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972); *NLRB v. General Truck Drivers, Warehousemen, Helpers and Automotive Employees, Local 315*, 545 F.2d 1173, 1175–76 (9th Cir.1976).

We conclude that Banks has made a sufficient showing of arbitrariness based upon Dorcas' witness policy to survive summary judgment. In doing so, we are not second guessing the Union's assessment of the grievance's merits. Rather, our concern is the same as that expressed in *Tenorio* that "the duty of fair representation requires that, *before* assessing the merits of a grievance, a union must have an ample basis upon which to make such an assessment." *Tenorio*, 680 F.2d at 602 (emphasis added). Whether the failure to interview and call union members who witnessed or had information concerning the incident prejudiced Banks, leading to the ultimate decision to terminate his employment, is a matter for exploration at trial.

### 2. Allegations of Bad Faith

■ We next turn to Banks' allegation that Hughes handled his grievance improperly. Specifically, Banks contends that Hughes' decision not to proceed to arbitration with his grievance constitutes bad faith on the part of the Union. It is well settled that unions do not have an absolute duty to take every grievance to arbitration. *See Moore v. Bechtel Power Corp.*, 840 F.2d 634, 637 (9th Cir.1988) (citing *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917). Further, "a disagreement between a union and an employee over a grievance, *standing alone*, [does not] constitute evidence of bad faith, even when the employee's grievance is meritorious." *Id.* (emphasis added) (citation omitted). In this case, however, Banks' disagreement with Hughes' decision not to arbitrate does not stand alone.

Banks, for instance, alleges that Hughes had an ulterior motive in settling his grievance: Hughes had recently been transferred to California and was attempting to close all of his files quickly so that he could leave. Although Hughes in his declaration and deposition asserted that he did not sacrifice any care in handling Banks' grievance, he also admitted that he wanted to bring as many of his cases to a close as possible. Whether Hughes' statement that he did not sacrifice any care in handling Banks' grievance is to be believed will turn on Hughes' credibility. Credibility issues are normally issues of fact to be decided by the fact finder. *See Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 2086, 56 L.Ed. 2d 677 (1978) (district court generally should not grant summary judgment based on its assessment of credibility of the evidence presented); *Robison v. Via*, 821 F.2d 913, 924 (2d Cir.1987) (same). Moreover, summary judgment is frequently inappropriate where there are material issues of intent, motive, or good faith. *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 185 (8th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); 6 J. Moore, *Moore's Federal Practice*, ¶ 56.17[41.–1] (2d ed. 1988); *see, e.g., Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 139 (9th Cir.1981).

■ Banks has also shown that there was strong disagreement *within the Union:* Dorcas, the local president, was "shocked" when he heard that Hughes had decided not to proceed to arbitration. Moreover, Banks has argued that in light of the strength of his case and his 12–year unblemished record as a worker at Bethlehem, Hughes could not possibly have believed in good faith that the settlement was in Banks' best interest. While unions are accorded great leeway in deciding how to handle employee grievances, the merits of the underlying dispute or claim are not irrelevant to evaluating bad faith. *Zimmerman v. Foundation of the French Int'l School Rochambeau*, 830 F.2d 1316, 1319 (4th Cir.1987) ("The arguable merit to a grievance is one factor in considering whether a union acted in bad faith in re-

fusing to represent an employee." (citations omitted)); *Harrison v. United Transp. Union*, 530 F.2d 558, 561 (4th Cir. 1975) (per curiam) ("[P]roof of a grievance's merit is circumstantial evidence that the failure to process the claim constituted bad faith."), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), *disapproved on other grounds, International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *see also Bundy v. Penn Central Co.*, 455 F.2d 277, 279 (6th Cir.1972); M. Player, *Employment Discrimination Law* 74 (West 1988) ("*Vaca [v. Sipes]* does not hold that the merits of the contract dispute are irrelevant in evaluating the good faith or rationality of a union's refusal to process the grievance. The stronger or more obvious the merits of plaintiff's contract claim, the stronger the inference that the refusal to process it was either arbitrary or made in bad faith."). Banks has pointed to the relatively poor settlement negotiated by Hughes—a $3,000 payment and change of termination status to voluntary quit—as circumstantial evidence of Hughes' bad faith handling of his grievance. The settlement not only kept Banks from returning to work, but resulted in lost wages which, according to Banks, amounted to $90,000 by the time of trial.

Finally, the record indicates that Banks hired attorney Grad to help him deal with the Union regarding his grievance. Grad wrote numerous letters and made several calls to Hughes in regard to Banks' grievance. In a letter dated January 4, a full five weeks before Hughes settled the case, Grad informed Hughes that

> Mr. Banks has advised that he has a witness to the incident upon which the employer claims justification for the termination or a suspension. Mr. Banks' witness would corroborate that Banks' involvement with the incident resulting in his termination is not sufficient to justify that termination. The witness is a fellow employee.

According to Grad, Hughes adamantly refused to accept Grad's assistance, and never inquired about the specifics of the witness' anticipated testimony.

Standing alone, Banks' disagreement with Hughes over the handling of his grievance would not constitute evidence of bad faith. Nor would a bare allegation of Hughes' ulterior motive withstand a motion for summary judgment. Viewed together with Banks' other allegations and evidence in the record regarding disagreement within the Union, the merits of his claim, the small amount acquired in settlement by Hughes, and Hughes' refusal to accept the assistance of Banks' attorney, Banks' allegations take on more weight. Because of the posture of this case, we must view this evidence in the light most favorable to Banks and consider whether there is a genuine issue of material fact. Banks has raised a genuine issue of material fact as to whether Hughes exercised his discretion with "complete good faith and honesty of purpose," *Huffman*, 345 U.S. at 338, 73 S.Ct. at 686. Therefore, the issue should not be resolved at the summary judgment stage.

In sum, we conclude that Banks has produced sufficient evidence to raise triable issues of material fact regarding both the impact of Dorcas' arbitrary witness policy on the resolution of his case and whether Hughes' decision to settle was made in good faith. Summary judgment was therefore inappropriate.

### III.

### RACE DISCRIMINATION

In addition to his allegations against the Union, Banks also contends that his discharge by Bethlehem was racially motivated in violation of Title VII, 42 U.S.C. § 1981, and Wash.Rev.Code ch. 49.60. Banks acknowledges that the framework for analysis under all three of these statutes is essentially the same. *See Wilmington v. J.I. Case Co.*, 793 F.2d 909, 914 (8th Cir.1986); *Hollingsworth v. Washington Mut. Sav. Bank*, 37 Wash.App. 386, 681 P.2d 845, 848 (1984). Thus, all of his racial discrimination claims stand or fall together. After a full bench trial in which the court considered the evidence of racial discrimination presented by Banks, the magistrate concluded that "[r]ace was not a factor in the decision by [Bethlehem] to terminate Johnny Banks." Findings of Fact and Con-

clusions of Law at 4, *Banks v. Bethlehem Steel Corp.*, No. C85–692S (W.D.Wash. June 12, 1987) [1987 WL 12806]. We will not disturb the magistrate's findings of fact unless they are clearly erroneous. *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1275 (9th Cir.1981); *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). We have reviewed the evidence presented at trial and conclude that this finding was not clearly erroneous. The magistrate's decision on the discrimination claims against Bethlehem and Seattle Steel must be affirmed.

## CONCLUSION

The district court erred in granting summary judgment on the claim for breach of duty of fair representation by the Union; thus, we reverse and remand for further proceedings consistent with this opinion. However, the magistrate's judgment against Banks on the racial discrimination claims was well supported by the evidence and is therefore affirmed.

Appellees' request for attorneys' fees is DENIED. Each party shall bear its own costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.