John A. PETERS, Plaintiff–Appellant,

v.

BURLINGTON NORTHERN RAILROAD COMPANY; The International Brotherhood of Iron Shipbuilders, Blacksmiths, Forgers, and Helpers; and, Lodge 1131 of the International Brotherhood of Boilermakers, Blacksmiths, Forgers and Helpers, Defendants–Appellees.

No. 88–3829.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1989.

Decided September 18, 1990.

As Amended on Denial of Rehearing and Rehearing En Banc April 23, 1991.

Michael G. Eiselein, Lyanugh, Fitzgerald & Eiselein, Billings, Mont., for plaintiff-appellant.

Jack Ramirez and Bruce R. Toole, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., Michael S. Wolly and Erick J. Genser, Mulholland & Hickey, Washington, D.C., for defendants-appellees.

Before BROWNING, ALARCON and CYNTHIA HOLCOMB HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Plaintiff-appellant John Peters ("Peters") appeals the district court's grant of summary judgment in favor of defendants-appellees Burlington Northern Railroad ("Burlington Northern"), the International Brotherhood of Iron Shipbuilders, Blacksmiths, Forgers and Helpers, and Lodge 1131 of the International Brotherhood of Boilermakers, Blacksmiths, Forgers and Helpers (collectively "the union"). Peters claims that Burlington Northern breached the controlling collective bargaining agreement by failing to pay him so-called "protective" benefits upon his being furloughed, and additionally that the union breached its duty of fair representation to him by failing to properly pursue his claim for benefits. The district court held that the union had not breached its duty of fair representation to Peters and that, consequently, the court lacked jurisdiction over Peters's breach of contract claim against Burlington Northern. We reverse.

I

Peters began working as a laborer for Burlington Northern's predecessor, the Northern Pacific Railroad, on August 2, 1950. When Burlington Northern was created by a merger of Northern Pacific Railroad and other railroads, Peters was still employed as a laborer. He continued working as a laborer for Burlington Northern after the merger. In December, 1977, Peters was promoted to blacksmith and was assigned to the coal car repair shop in Laurel, Montana.

In June, 1983, Burlington Northern advised its employees that it intended to transfer the repair shop from Laurel, Montana, to Havelock, Nebraska. As a result of the transfer of work from the discontinued repair shop, 19 employee positions were abolished at the end of October, 1983. These employees were furloughed, and it appears that at least 17 of them were given some sort of compensation due to the transfer of work.

Peters, along with one other blacksmith named Krum, continued to work at Laurel for an additional 4½ months. Their jobs were finally abolished on March 12, 1984, and accordingly, they were furloughed. It appears to be undisputed that the abolition of their positions was due to the earlier transfer of work: the Public Law Board that ultimately heard Peters's and Krum's claims for protective benefits concluded that the two men's positions had been abolished by the transfer of the repair shop to Nebraska.

The union serves as the exclusive collective bargaining representative for blacksmith employees of Burlington Northern; as such, the union represented Peters at all relevant times during this dispute. Burlington Northern and the union are parties to several collective bargaining agreements, one of which is relevant here: The National Mediation Agreement ("the Agreement") of September 25, 1964. The Agreement provides for so-called "protective" rights to be granted to workers under certain specified situations, summarized as follows:

* Article I, Section 6 states that "[a]ny employee who is deprived of employment as a result of a change in operations for any of the reasons set forth in Section 2 hereof shall be accorded a monthly dismissal allowance in accordance with terms and conditions set forth" in a separate agreement.

* Article I, Section 2 provides that protective benefits will be awarded to "employees who are deprived of employment or placed in a worse position with respect to compensation and rules governing working conditions as a result of" any of a list of enumerated employer operational changes, including "a. Transfer of Work."

* Article I, Section 3 states that "[a]n employee shall not be regarded as deprived of employment or placed in a worse position with respect to his compensation and rules governing working conditions in case of his ... retirement."

* Article I, Section 7 states that "[a]ny employee eligible to receive a monthly dismissal allowance under Section 6 may, at his option at the time he becomes eligible, resign and (in lieu of all other benefits and protections provided in this agreement) accept in a lump sum a separation allowance determined in accordance with the provisions of" a separate agreement.

Peters contends that on March 5, 1984, the day he was notified of the abolition of his job, he spoke to Union representative and International President Brian Johnson ("Johnson") about the ramifications of his being furloughed. He states that Johnson told him that he had "lost everything" and that Peters should "take his pension." Peters claims that he relied on this erroneous advice by resigning and accepting retirement benefits on March 14, 1984.

The union disputes Peters's account in two ways. First, it claims that Johnson's remarks concerned "Peters' right to protection flowing from his status as a laborer who had worked for a predecessor railroad at the time of the merger which created Burlington Northern, and the effect Peters' becoming a blacksmith mechanic had on that right." These are so-called "merger protection" rights, and the union contends that the "lost everything" comment only concerned such rights, as evidenced by the full quote given by Peters at his deposition, "lost everything by going up to mechanic", as well as by a follow-up letter sent by Johnson that refers to their previous discussion of "labor merger protection." [1]

Second, the union contends that, in any event, Peters did not retire because of Johnson's advice. It relies on the following facts gleaned from Peters's own deposition testimony: Peters expressed concern to Johnson about the length of time it would take to process a claim for protective benefits, stating that "he might have to retire because unemployment benefits were insufficient to sustain him while a claim was being processed"; Peters went to the office of Burlington Northern's regional Manager of Relations on March 14, 1984 to see if the railroad would be willing to arrange for a

---

**1.** Nonetheless, the union does concede that during Johnson's first conversation with Peters, Johnson told Peters that he did not think the layoff was the result of a shop closure. Peters does not seize upon this language as an indication that the "lost everything" quote referred to "transfer of work" protective benefits, and it is admittedly unclear from the briefs whether this quote took place during the same conversation in which Johnson said that he did not think a shop closure was involved. The union alleges that two telephone conversations took place between Johnson and Peters, although it does not definitively place the "lost everything" remark as originating from one or the other. Peters, on the other hand, insists that he only had one telephone conversation with Johnson.

buyout of his job, a lump-sum cash payment in lieu of rights and benefits, but the manager refused his request; immediately following this unsuccessful attempt, Peters formally retired from his position, although he did call his wife from the retirement office to discuss the situation. The union also quotes written correspondence from both Peters and his attorney culled from the Record indicating that financial considerations, not worries about the strength of his claim, spurred Peters's decision to retire.

On April 2, 1984, Johnson filed a claim for protective benefits on behalf of Peters. Johnson took the claim to arbitration before Public Law Board 2869. The neutral referee who heard the case agreed that a "transfer of work" had occurred pursuant to Article I, Section 2 of the Agreement, but that Peters was nonetheless ineligible for benefits, according to Article I, Section 3, because of his retirement. The decision made no reference to Article I, Section 7, which provides the option of a lump-sum payment for any otherwise eligible employee who resigns his position.

Peters contends that the union—and specifically Johnson—neither researched, nor pointed the arbitrators to, Article I, Section 7 of the Agreement. The union responds that research was unnecessary because Johnson knew what the Agreement said. The only reason the union sets forth for Johnson's failure to respond to Burlington Northern's retirement argument comes from Johnson's own deposition: "I was kind of hoping it would go away." Apparently, the union's written submissions to the arbitrators made no reference to Article I, Section 7 of the Agreement. Johnson testified, however, that he "may have" discussed the retirement issue at the oral presentation, and that he did not "recall specifically that we got into that but I think we probably did." Peters disputes this.

Peters filed a lawsuit against both Burlington Northern and the union in March, 1986, alleging a) breach of contract and b) fraud against Burlington Northern and c) breach of the duty of fair representation and d) fraud against the union. After the case was removed to federal court, the district court dismissed the two claims for fraud on the basis that such state law claims were preempted by federal law. The district court also denied Burlington Northern's motion to dismiss for failure to exhaust administrative remedies. On April 13, 1988, the district court filed its order granting summary judgment for both the union and Burlington Northern. The court ruled that there were no material issues of fact on the question of the union's breach of its duty of fair representation, and that the union had not acted arbitrarily in violation of its duty to Peters. The court then ruled that because the duty of fair representation had not been breached, established precedent rendered the court powerless to hear the breach of contract claim against Burlington Northern.

Peters now timely appeals. While conceding that subject matter jurisdiction over its breach of contract claim against Burlington Northern is dependent upon a showing that the union breached its duty of fair representation to him, he asserts that triable issues of fact exist as to whether the duty was breached.

The district court had subject-matter jurisdiction over Peters's claim against the union pursuant to 28 U.S.C. § 1337, which grants district courts jurisdiction over unfair representation claims arising under the Railway Labor Act, 45 U.S.C. § 151 *et seq. See Bautista v. Pan Am. World Airlines, Inc.,* 828 F.2d 546, 549 (9th Cir.1987). The district court correctly concluded that its jurisdiction over the contractual claim against Burlington Northern was contingent upon a showing by Peters that he had a triable claim against the union. *See id.* at 551–52.

II

A

■ We review *de novo* the granting of a motion for summary judgment, applying the same standard that was used by the trial court. *E.g., Banks v. Bethlehem Steel Corp.,* 870 F.2d 1438, 1441 (9th Cir. 1989). That standard, governed by Fed.R.

Civ.P. 56(c), requires us to determine whether there are any genuine issues of material fact and whether the district court properly applied the relevant substantive law, viewing the evidence in the light most favorable to the nonmoving party. *Id.* "Specifically, whether a union's conduct amounted to a breach of the union's duty of fair representation presents a mixed question of law and fact that we review de novo." *Burkevich v. Air Line Pilots Ass'n, Int'l,* 894 F.2d 346, 349 (9th Cir. 1990).

### B

"To establish a breach of the duty of fair representation, an employee must show that the union's conduct towards him was 'arbitrary, discriminatory, or in bad faith.'" *Dutrisac v. Caterpillar Tractor Co.,* 749 F.2d 1270, 1272 (9th Cir.1983) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967)). Peters contends that the union acted arbitrarily by 1) failing to notify the arbitration panel charged with hearing his claim for protective benefits of Article I, Section 7 of the Agreement and 2) representing to Peters before filing his grievance that his claim for protective benefits was weak.

The precise contours of the phrase "arbitrary conduct" have proved difficult for us to delineate. We have defined it variously as unintentional conduct showing "an egregious disregard for the rights of union members," *Tenorio v. NLRB,* 680 F.2d 598, 601 (9th Cir.1982), or even a "reckless disregard" of such rights, *Johnson v. United States Postal Serv.,* 756 F.2d 1461, 1465 (9th Cir.1985); conduct "without [a] rational basis," *Robesky v. Qantas Empire Airways Ltd.,* 573 F.2d 1082, 1089 (9th Cir. 1978); and omissions that are "egregious, unfair and unrelated to legitimate union interests," *Johnson,* 756 F.2d at 1465. *See also Galindo v. Stoody Co.,* 793 F.2d 1502, 1514 n. 9 (9th Cir.1986) (listing various formulations of the standard). The Supreme Court early on explained that a union acts arbitrarily when it "ignore[s] a meritorious grievance or process[es] it in a perfunctory

fashion." *Vaca v. Sipes,* 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967).

■ Nonetheless, mere negligence on the part of a union does not rise to the level of a breach of the duty of fair representation. *See, e.g., Peterson v. Kennedy,* 771 F.2d 1244, 1253 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986); *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1482 (9th Cir.1985); *see also Herring v. Delta Air Lines, Inc.,* 894 F.2d 1020, 1023 (9th Cir.1990) ("[A] union does not breach its duty of fair representation to others as long as it proceeds on some reasoned basis."); *Eichelberger v. NLRB,* 765 F.2d 851, 856 (9th Cir.1985) (stating that " 'something more' " than negligence must be shown). The Supreme Court itself recently supported this proposition. *See United Steelworkers of America, AFL–CIO–CLC v. Rawson,* —— U.S. ——, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362 (1990). We have construed the duty narrowly "[b]ecause unions must retain discretion to act in what they perceive to be their members' best interests." *Galindo,* 793 F.2d at 1514; *see also Herring,* 894 F.2d at 1023 ("[A union] must be able to focus on the needs of its whole membership without undue fear of law suits from individual members.") (citation omitted); *Peterson,* 771 F.2d at 1255 (arguing that unions must be given wide latitude to make judgment calls because negligence liability would lead to "the direct costs of adverse judgments [being] passed on to members in the form of increased dues," and to hesitancy on the parts of unions to guide members in collective bargaining); *Dutrisac,* 749 F.2d at 1273 ("Because the union must balance many collective and individual interests when it decides whether and to what extent to pursue a particular grievance, courts should accord substantial deference to the union's decisions. To hold the union liable for mere errors of judgment in processing grievances would defeat the employees' collective interest in having a strong and effective union.") (citation omitted). The policy of promoting strong unions, then, often must trump the claims of individual employees. *See id.*

Two of our more recent opinions have attempted to distinguish between the merely negligent acts of unions and the more egregious lapses that give rise to a breach of the duty of fair representation. In *Dutrisac* we surveyed the field of fair representation decisions and noted that cases in which "mere negligence" was found to be implicated tended to "involve alleged errors in the union's evaluation of the merits of a grievance, ... in its interpretation of the collective bargaining agreement, ... or in its decisions concerning presentation of the grievance at the arbitration hearing." *Id.* at 1273 (citation omitted). By contrast, "[w]hen the challenged conduct is not an erroneous decision by the union but its failure to perform a ministerial act required to carry out the decision, courts have been more willing to impose liability for merely negligent conduct." *Id.* We rearticulated this dichotomy in *Peterson:*

> There are some significant general principles that emerge from our previous decisions. In all cases in which we found a breach of the duty of fair representation based on a union's arbitrary conduct, it is clear that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct....
>
> We have never held that a union has acted in an arbitrary manner where the challenged conduct involved the union's judgment as to how best to handle a grievance. To the contrary, we have held consistently that unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances.

771 F.2d at 1254; *see also Moore v. Bechtel Power Corp.,* 840 F.2d 634, 636 (9th Cir. 1988) ("In our application of this doctrine, we first ask whether the act in question involved the union's judgment, or whether it was 'procedural or ministerial.' ").

Although the dichotomy we identified in *Dutrisac* and *Peterson* provides a court with useful guideposts, differentiating a ministerial task from a judgment call is not always easily accomplished. First, the no-

tion that these types of action are polar opposites is in some sense illusory. Even the most rote tasks—such as complying with the deadline for filing a grievance, *see Dutrisac,* 749 F.2d at 1273–74—require a modicum of judgment. The union must read procedural rules, understand them, and act upon them. Moreover, some substantive decisions require little thought on the union's part because either the correct interpretation of a particular collective bargaining agreement has already been determined in an earlier grievance procedure or is the only one which is in any sense rational. These decisions do not provide a union with the same wide leeway in fashioning rational substantive arguments to present before an arbitrator that more novel and difficult problems do.

Second, the dichotomy we recognized in *Peterson* was merely a convenient shortcut for segregating acts of judgment from acts of nonjudgment. Surely an act need not fall within the strict "procedural" rubric in order for it to have been undertaken indifferently or recklessly. When a union inexplicably ignores a strong substantive argument that must be advanced in order for the employee to prevail on the merits of his grievance, the egregious nature of its failure transcends mere negligence. The Supreme Court in *Vaca* recognized this by ruling that a union acts arbitrarily when it "process[es] [a meritorious grievance] in a perfunctory fashion," 386 U.S. at 191, 87 S.Ct. at 917. We recognized this by ruling that in order "[t]o comply with its duty [of fair representation], a union must conduct some minimal investigation of grievances brought to its attention," *Tenorio v. NLRB,* 680 F.2d 598, 601 (9th Cir.1982).

Accordingly, we believe that the labels "ministerial act" and "act of judgment" represent not absolute categories without relation to one another but opposing points on a continuum that broadly attempts to separate discretionary decision making from inexplicable conduct. At one end of this continuum are procedural imperatives over which a union rarely agonizes by virtue of the fact that they do not necessitate the exercise of much judgment. At the

other end are actual, rational attempts on the part of a union to properly interpret a collective bargaining agreement or otherwise handle a grievance. In between these extremes, however, lie situations in which a particular union might give the most cursory consideration to or even unaccountably avoid a substantive dilemma. In these situations, it makes little sense to allow a union to hide behind the mantle of "judgment" and "discretion" when the evidence suggests that it actually exercised neither. *See Herring*, 894 F.2d at 1023 (explaining union's obligation to "proceed[ ] on some reasoned basis"). In short, a union's unexplained failure to consider a meritorious substantive argument in favor of an employee signals that the process has broken down and has much more in common with a ministerial failure than with a negligent decision.

This approach obligates us to evaluate the strength of the employee's grievance, something we have sanctioned in the past. *See, e.g., Johnson*, 756 F.2d at 1466. If the employee's position is fundamentally weak, the union can hardly be faulted for failing to brood over it. But if the employee's position has merit, it makes no sense to presume that the union exercised judgment when the evidence suggests otherwise. Even *Salinas v. Milne Truck Lines, Inc.*, 846 F.2d 568 (9th Cir.1988), which the union relies heavily upon, does not suggest otherwise. In *Salinas* an employee accused his union of misinterpreting a clause in the operative collective bargaining agreement. It is true that in response to this argument we evidenced a willingness to presume that the union in fact exercised judgment in rejecting the employee's construction: "In this case, the union may have rejected Salinas's interpretation ... as meritless. The union may have overlooked Salinas's interpretation ... entirely, or the union may have found Salinas's interpretation meritorious but failed to present the interpretation at the hearing." *Id.* at 569. But it is

also true that the union in *Salinas* came forward with a rational explanation why it had chosen not to advance the employee's construction of the collective bargaining agreement: "Local 63 did not make the 'prior incident' argument because past grievance hearings had upheld the discharge of drivers without a warning for any prior incident." *Id.*

■ If a union provides an explanation for having ignored a particularly strong argument during a grievance procedure that is based on reasoning, we will not question whether the reasoning was faulty or not. To do so would penalize the union for mere negligent decision making. But we must be able to determine whether the union deliberated the issue in the first place.

■ Here, Peters has submitted enough evidence that the union processed his grievance in a perfunctory fashion to survive the union's motion for summary judgment. To begin with, he has identified two meritorious reasons why his acceptance of early retirement did not extinguish his right to receive protective benefits. First, Peters notes that he became eligible for protective benefits as a result of the transfer of the coal car repair shop before he decided to retire, making Article I, Section 3 of the Agreement, *see supra* pages 535–536, inapplicable. Second, Peters claims that Article I, Section 7 of the Agreement entitled him to resign and accept a lump sum payment in any event. We note that this section of the Agreement states that upon becoming eligible for protective benefits, an employee may "resign" and accept a lump-sum payment "in lieu of all other benefits and protections provided in this agreement." Because retirement benefits apparently are *not* provided for in the Agreement, Peters's interpretation has some merit.[2]

Peters also submitted evidence indicating that before processing his grievance, union

---

**2.** On the other hand, it is possible that the word "resign" as it is used in this section of the Agreement necessarily precludes the payment of a lump sum to those who not only resign but retire. Article I, Section 3, for instance, lists "resignation" and "retirement" as separate reasons for which an employee will not be regarded as being deprived of employment. Nonetheless, the argument presented by Peters retains much merit.

representative Johnson told him that he would not be entitled to protective benefits. Although the union responds that this comment was made in reference to a different category of benefits, we must view the evidence in the light most favorable to Peters, the nonmoving party. Peters uses this comment as evidence that when the union finally filed his grievance, it pursued Peters's interests in a perfunctory manner.

We also note that the union's response to Peters's reading of the Agreement is not that it is incorrect, or indeed anything other than clear. Instead, the union merely cites to the judgmental/ministerial act dichotomy and states that its actions were necessarily and inherently a matter of judgment and strategy.[3] In short, although we are mindful that it is Peters who has the burden of establishing the existence of a genuine issue of material fact, we find it significant that the union has failed to explain the basis for its failure to point the referee who heard the grievance to Article I, Section 7 of the Agreement. For Peters has provided enough other evidence to overcome any presumption we might normally have that a union exercises its judgment when presenting the substance of a grievance before arbitrators. Had the union explained its actions as the product of judgment, whether sound or flawed, we might very well have been forced to conclude that Peters on balance failed to prove the existence of a material factual issue. As matters now stand, however, we must remand because Peters had presented a triable question as to whether the union acted in a completely arbitrary, indifferent manner by failing to research the Agreement.

## III

Burlington Northern argues that the district court lacks authority to exercise jurisdiction over Peters's claims against it, asserting that under the Railway Labor Act these claims may only be handled through arbitration. However, if an employee alleges inadequate union representation, a district court can in some circumstances exercise jurisdiction over the employee's claim against his employer. See *Glover v. St. Louis–San Francisco Railway*, 393 U.S. 324, 329–30, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969) (employee alleges discriminatory representation).[4]

Ninth Circuit authority supports the view that in this case *Glover* is applicable. In *Crusos v. United Transp. Union, Local 1201*, 786 F.2d 970 (9th Cir.), *cert. denied*, 479 U.S. 934, 107 S.Ct. 409, 93 L.Ed.2d 361 (1986), the court considered the availability of the *Glover* action. The *Crusos* court held that the union had not failed to adequately represent the plaintiff. The *Crusos* court accordingly also held that the *Glover* action against the employer was unavailable, reasoning that there was no indication that the arbitrator would not have corrected any employer abuses. *Crusos*, 786 F.2d at 972–73.

In the instant case, if the union indeed breached its duty of fair representation, the referee's decision was most likely tainted. We have no reason to assume that the

---

**3.** Ironically, only Burlington Northern takes issue with Peters's reading of the Agreement. The railroad claims that Peters did not, and indeed could not, become eligible for protective benefits on the day he was furloughed. "Eligibility," the railroad seems to say, cannot arise until the arbitration panel hearing a claim for the benefits decides they should be awarded. As an initial matter, we have qualms about this interpretation; it would make more sense if Article I, Section 7 used the word "entitled" rather than merely "eligible." More important, however, is the fact that the railroad's argument, even if compelling, does nothing to establish that the union itself interpreted the Agreement in this—or any other—way.

**4.** A previous arbitration decision is not binding if a union has breached its duty of good faith. See *Glover*, 393 U.S. at 329–30, 89 S.Ct. at 551. As stated by the Supreme Court in *Hines v. Anchor Motor Freight*, 424 U.S. 554, 570, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976), a case decided under the National Labor Relations Act, "if the contractual processes have been seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct" then the arbitrator's decision is not binding. In this case the arbitration was tainted if the union failed to adequately represent Peters before the arbitrator by acting in an arbitrary manner, and this issue will be determined on remand.

arbitrator considered the effect of Article I, Section 7 of the Agreement on Peters's claim for protective benefits if the union did not point him to this provision. As such, the union's failure would have seriously flawed the arbitrator's decision.

The applicability of the *Glover* action was also addressed in *Bautista v. Pan American World Airlines, Inc.*, 828 F.2d 546 (9th Cir.1987). The court dismissed the plaintiff's action against his union for inadequate representation. The court then held that *Glover* was inapplicable, reasoning that "[i]f ... the employee does not have a triable claim against the union, then all that is left is his claim against the employer. In that event, *Glover* does not apply and the RLA requires that the claim be heard before the Adjustment Board." *Id.* at 551–52.

In the instant case, unlike *Bautista*, we have held that Peters's claim against his union survives summary judgment. The *Glover* action against Peters's employer thus appears to be available, at least as long as Peters's claim against the union remains alive.

### IV

The decision of the district court is REVERSED and REMANDED.