**Michael TENORIO & Gil Fowler, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**San Francisco Web Pressmen and Platemakers' Union No. 4, Intervenor.**

No. 80–7648.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 10, 1981.

Decided June 29, 1982.

Rehearing and Rehearing En Banc Denied Oct. 13, 1982.

Joe R. McCray, William G. Lewis, San Francisco, Cal., for petitioners.

Ruah Donnelly Lahey, Washington, D. C., argued, for respondent; William Wachter, Washington, D. C., on brief.

Matthew D. Ross, Davis, Frommer & Jessinger, San Francisco, for intervenor.

Before BAZELON,* Senior Circuit Judge, HUG and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Gil Fowler and Mike Tenorio (petitioners) contend that the San Francisco Web Pressmen and Platemakers' Union No. 4 (the Union) breached its duty of fair representation in violation of National Labor Relations Act (NLRA) § 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A) by making no effort to obtain their version of the events that led to their discharge before processing their

---

* Honorable David L. Bazelon, Senior Circuit Judge for the District of Columbia Circuit, sitting by designation.

grievance. The National Labor Relations Board found in favor of the Union. We reverse.

## FACTS

Petitioners joined the Union upon commencing employment with the San Francisco Newspaper Printing Company (employer) in November, 1977.[1] In August, 1978, petitioners became involved in a barroom altercation with a fellow Union member. Although the fight occurred away from the employer's premises, the Union initiated an investigation. Upon learning of the petitioners' involvement in the fight, the Union Executive Board asked Fowler and Tenorio to appear before it to answer questions. They decided not to appear, thinking that the fight had been a private matter of no concern to the Union. They telephoned Paul Trimble, an Executive Board member to inform him of their decision. Uncertain that Trimble had understood their position, petitioners visited Trimble at work.

Trimble reported the pressroom confrontation with petitioners to his foreman and claimed to have felt threatened.[2] The foreman related Trimble's story to other supervisors, who decided to discharge the petitioners. The employer formally discharged petitioners early the next day.

Upon learning of the discharge, Union President Richard Munger filed a grievance on the petitioners' behalf. At the direction of Vice-President David Ratto, the Union also immediately prepared travel cards[3] for petitioners, effectively barring them from working as pressmen in Northern California.

The Union conducted an investigation of the confrontation between Trimble and the petitioners. Munger interviewed Trimble and two eyewitnesses. However, despite its policy of talking to discharged workers to get their story regarding discharges, the Union never interviewed Fowler or Tenorio, purportedly because it had neither their addresses nor telephone numbers. Yet, one Union official testified that he had had addresses for both men at the time of the investigation. Moreover, Ratto met twice with petitioners prior to the first stage of the grievance proceedings, a meeting of the Joint Standing Committee, without making inquiry into petitioners' explanation of the pressroom conversation.

The Joint Standing Committee, composed of two employer representatives and Munger and Ratto, met and reviewed the merits of the grievance. Among the evidence considered were written statements made by Trimble and the two eyewitnesses. No effort was made to contact or confer with either Fowler or Tenorio. Munger and Ratto decided, based on the written statements and "on the entire circumstances and merits of the whole grievance," to acquiesce in the dismissal; the Union decided "not to pursue it [the grievance] to arbitration". The Union's membership subsequently voted to approve the Union's settlement of the grievance.

Petitioners then filed a claim with the National Labor Relations Board. An administrative law judge (ALJ) concluded that, although the Union had harbored no animosity toward petitioners, it had processed their grievance arbitrarily and perfunctorily. He reasoned that because Fowl-

1. Both men had previously worked in the Washington, D.C., area, which they left after losing their jobs because of violent strike activities.

2. Upon finding Trimble in the pressroom, Fowler addressed him in a loud voice, asking to speak with him. When Trimble invited Fowler to talk he declined, replying "I don't want to talk to you here. Let's go out—Let's walk outside. I want to talk to you outside." Trimble refused to leave the pressroom. Fowler then asked Trimble when he got off work. Upon receiving Trimble's response, Fowler re-

marked, "I'll talk to you then." During this exchange, Tenorio remained quiet. Neither Fowler nor Tenorio met with Trimble after he left work at 5 a. m.

3. Travel cards are usually issued at the request of an employee who plans to leave the area. They indicate that the holder is a member of the union in good standing, having paid all dues and not having any outstanding fines. The cards, however, preclude the holder from further dispatch by the issuing union chapter.

er's remarks to Trimble were susceptible to more than one interpretation, the Union was obligated at least to attempt to obtain petitioners' explanation of their conduct. The Union's failure to make such an effort constituted a breach of its duty of fair representation. The Union appealed that decision to the Board, which reversed, finding that under the circumstances of this case, the Union had no duty to attempt to learn petitioners' story. Petitioners appeal from the Board's decision. We have jurisdiction pursuant to NLRA § 10(f), 29 U.S.C. § 160(f).

## DISCUSSION

### A. The Standard of Review

■■■ We cannot review the Union's conduct de novo. Instead, we accept as conclusive the Board's findings if substantial evidence in the record as a whole supports those findings. 29 U.S.C. § 160(f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924, 928 (9th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980). The fact that the Board's conclusion differed from that of the ALJ does not alter the applicable standard of review. *NLRB v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir. 1978), but it causes us to engage in a "more searching" review. *Doug Hartley, Inc. v. NLRB*, 669 F.2d 579 (9th Cir. 1982). The ALJ's decision is an integral part of the record and must be considered. *Universal Camera Corp.*, 340 U.S. at 493, 71 S.Ct. at 467. Our task in applying the substantial evidence test is not merely to look for evidence supporting the Board's finding, but to determine whether that evidence is substantial after taking into account whatever in the record fairly detracts from its weight. *Universal Camera Corp.*, 340 U.S.

at 488, 71 S.Ct. at 464; *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 877 (9th Cir. 1978). We shall affirm the Board's decision unless we can conscientiously find that its decision is not supported by substantial evidence. *Dalewood Rehabilitation Hospital, Inc. v. NLRB*, 566 F.2d 77, 80 (9th Cir. 1977).

### B. The Duty of Fair Representation

■■■ A union breaches its duty of fair representation if it processes a member's grievance in an arbitrary or perfunctory manner.[4] *Vaca v. Sipes*, 386 U.S. at 190–91, 87 S.Ct. at 916–917. To comply with its duty, a union must conduct some minimal investigation of grievances brought to its attention. *NLRB v. American Postal Workers Union*, 618 F.2d 1249, 1255 (8th Cir. 1980); *De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL–CIO*, 425 F.2d 281, 284–85 (1st Cir.), *cert. denied*, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970). The thoroughness with which unions must investigate grievances in order to satisfy their duty varies with the circumstances of each case. Although we afford unions a reasonable range of discretion in deciding how best to handle grievances, union conduct that shows an egregious disregard for the rights of union members constitutes a breach of the duty of fair representation. *Ness v. Safeway Stores, Inc.*, 598 F.2d 558, 560 (9th Cir. 1979) (per curiam); *Robesky v. Qantas Empire Airways Ltd.*, 573 F.2d 1082, 1086 (9th Cir. 1978).

■■■ Petitioners contend that the Union's investigation was so grossly inadequate as to transcend negligence and poor judgment. They argue that, by making no effort to hear their explanation of the events that resulted in their discharge, the Union showed a reckless disregard for their rights and thereby breached its duty of fair representation. We agree.

---

4. Although discriminatory or bad faith dealings by a union with any of its members constitutes a breach of its duty of fair representation, *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), we need not decide whether the Union in the instant case harbored animosity toward petitioners or handled their grievance in bad faith. The ALJ found no animosity, discrimination, or bad faith. Because neither party excepted to this finding, the Board accepted it as true, and we must do the same. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311–12 n.10, 99 S.Ct. 1123, 1129–1130 n.10, 59 L.Ed.2d 333 (1979).

The circumstances of this case indicate that the Union handled petitioners' grievance arbitrarily and perfunctorily. First, the record indicates that the Union departed from its policy of interviewing all discharged employees to obtain their story before processing their grievances. Because unions must adhere to rational decision-making processes, *NLRB v. General Truck Drivers*, 545 F.2d 1173, 1175 (9th Cir. 1976), the Union's departure from its policy causes us to inquire whether the Union had a legitimate basis for doing so. We find none. The Union had ample opportunity to ascertain petitioners' version of the pressroom conversation that led to their discharge.

Second, the dispute in this case involved a Union official—Trimble—and therefore involved potential conflicts of interest for the Union in its handling of the grievance. In its role as the employees' exclusive representative, the Union must be careful to protect the interest of all those whom it represents. *Vaca v. Sipes*, 386 U.S. at 177, 87 S.Ct. at 909; *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38, 73 S.Ct. 681, 685–686, 97 L.Ed. 1048 (1953). Union officials must be cautious not to succumb to the influence of personal preferences. *American Postal Workers Union*, 618 F.2d at 1255. Disputes involving both a union official and a union member may give rise to a tension between the union's loyalty to its officials and its duty to rank-and-file members. We think that this possible conflict of interest places an additional responsibility on the union to assure that it handles its members' grievances fairly. The Union should have made at least some effort to learn petitioners' version of the pressroom confrontation.

Third, the fact that the Union promptly issued travel cards to petitioners suggests that it intended to handle their grievance in a summary manner. This action showed that the Union had accepted Trimble's version of what had happened without even attempting to hear petitioners' story.

■ Finally, the Union needed to exercise special care in handling petitioners' grievance because they concerned discharges, the most serious sanction an employer can impose. *See Griffin v. International Union*, 469 F.2d 181, 183 (4th Cir. 1972). We find no indication in the record that the Union took special care with petitioners' grievance.

In light of these considerations, we cannot conscientiously find that substantial evidence supports the Board's finding that the Union was not obligated to attempt to ascertain the petitioners' version of the events that led to their discharge. The totality of these circumstances indicates that the Union's handling of petitioners' grievance was so inadequate and showed such an egregious disregard for their rights that it constituted a breach of the duty of fair representation. In reaching this conclusion, we are not second-guessing the Union's assessment of the merits of petitioners' grievance.[5] We recognize that a union's responsibilities often require it to assess the relative merit of the grievances presented by its members. *See Vaca v. Sipes*, 386 U.S. at 191, 87 S.Ct. at 917; *Fountain v. Safeway Stores, Inc.*, 555 F.2d 753, 756–57 (9th Cir. 1977). However, the duty of fair representation requires that, before assessing the merits of a grievance, a union must have an ample basis upon which to make such an assessment. The Union in the instant case lacked such a basis.

Both the Board and the employer, an intervenor in this action, warn that ruling in favor of petitioners will effectively establish a per se rule requiring unions to

---

5. We are neither asked to, nor do we, intimate any opinion regarding how the merits of petitioners' grievance should be decided. We note, however, that the dissent states that it is extremely doubtful that Tenorio and Fowler's version of the incident would have been given any weight by the employer or have altered the Union's conclusion that the grievance was meritless. Accordingly, Judge Hug concludes that if there was any error, it was harmless. Whether the employer would have been influenced is not the question. The interviews could have resulted in the Union deciding to submit the case to arbitration. Where, as here, the incident is subject to varying inferences depending on perceptions and tones of voice, it is entirely possible that a different result could have ensued.

obtain explanations from every grievant or discharged employee. These warnings overstate the reach of our holding. We have based our conclusion on the particular circumstances of this case.

REVERSED and REMANDED to the Board for further proceedings in accordance with this opinion.

HUG, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion correctly sets forth the legal standard to be applied in determining whether a union has breached its duty of fair representation to a union member—that is, whether the union has processed the member's grievance in an arbitrary or perfunctory manner. *Vaca v. Sipes*, 386 U.S. 171, 190–91, 87 S.Ct. 903, 916–917, 17 L.Ed.2d 842 (1967). It is clear that this was the standard applied by the Board. We are thus only concerned with the question whether the findings of the Board, under that standard, should be upheld. The majority opinion correctly observes that we must accept as conclusive the Board's findings, if substantial evidence in the record as a whole supports those findings. It is also clear that the ALJ's decision is a part of that record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1076 (9th Cir. 1977).

The majority opinion finds it necessary to hold the Board's conclusion to a more searching review because it differed from that of the ALJ. The authority relied upon by the majority, however, addresses the situation where the ALJ is overruled by the Board on peculiarly factual questions. *See e.g. Doug Hartley, Inc. v. NLRB*, 669 F.2d 579 (9th Cir. 1982) (credibility determinations involving conflicting testimony on motivation for discharge); *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924, 928–29 (9th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980) (determination whether two entities constitute a single employer is "essentially a factual one").

In the present case, the Board and the ALJ did not differ in their factual determi-

nation, but rather in the conclusions to be drawn from the accepted facts. This case is similar to *Kallman v. NLRB*, 640 F.2d 1094 (9th Cir. 1981). There the court upheld the Board's determination, which differed from the ALJ's, stating: "[t]he Board did not disagree with the ALJ's assessment of witness credibility, rather it drew different inferences from the testimony itself. The Board has special expertise in drawing these kinds of inferences, and its determinations are entitled to judicial deference." *Id.* at 1099 (footnote omitted).

Here, as in *Kallman*, the Board did not disagree with the ALJ's assessment of witness credibility. The Board's conclusion is within its area of special expertise. Thus, we are not dealing with the kind of ALJ determination that, as contrary evidence, detracts from the weight given to the Board's conclusion.

The Board's opinion almost exclusively addresses the scope of the union's duty, under the NLRA, to interview grievants. The Board's conclusion that the facts here did not require grievant interviews is clearly within its special expertise, and is entitled to judicial deference unfettered by consideration of the ALJ's contrary interpretation of the NLRA. "Of course, the judgment of the Board is subject to judicial review; but if its construction of the [NLRA] is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

A union is afforded great latitude in its handling of employee grievances. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563–64, 96 S.Ct. 1048, 1055–1056, 47 L.Ed.2d 231 (1976). In evaluating the fairness of a union's representation, the union is not to be held to a level of performance appropriate to a court of law. *See Findley v. Jones Motor Freight Corp.*, 639 F.2d 953, 958–59 (3d Cir. 1981). A union is granted the flexibility to do what is appropriate in the circumstances of each case. *See Ness v. Safeway Stores, Inc.*, 598 F.2d 558, 561 (9th Cir. 1979).

In this case, the Board looked to the union's conduct in processing Tenorio and Fowler's grievance. The Board was looking at the conduct of non-lawyers in a non-judicial setting. No doubt the Board recognized that it would have been preferable to have interviewed the grievants. It is a fact, however, that substantial, credible, and impartial eyewitness evidence was presented against Tenorio and Fowler at the grievance hearing. Can it be said that an interview with the men might have affected the ultimate outcome of that hearing? I think not. While, in another situation, the failure to interview might certainly rise to the requisite level of unfairness, here I would not find it such a serious shortcoming as to be arbitrary or perfunctory.

The ALJ's finding that the union harbored no animosity against the men was not excepted to by the parties, and was affirmed by the Board. This court must therefore accept that finding as correct. While the majority opinion acknowledges this, see majority opinion at 601, n.4, its discussion of the circumstances of this case notes the union's "departure from its [normal] policy" of interviewing grievants, the "possible conflict of interest" arising from "a tension between the union's loyalty to its officials and its duty to rank and file members," and evidence indicating that the union "intended to handle their grievance in a summary manner." Majority opinion at 602. These factors seem to go to the union's purpose in handling the grievance as it did. This type of analysis would seem to be precluded by the fact that no animosity existed.

In my opinion, the Board had substantial evidence to support its finding that the representation was not arbitrary or perfunctory. The evidence indicated that the union president personally filed the grievance for Tenorio and Fowler, then interviewed not only Trimble, but also the two neutral eyewitnesses to the confrontation. On the basis of this substantial and credible evidence, the relevant union officials decided that it was unnecessary to interview Tenorio and Fowler.

The union's investigation revealed that Tenorio, Fowler and a third man went to see Trimble while the latter was working. Fowler, acting as spokesman for the group, informed Trimble in a loud voice that they wished to speak with him. No explanation was offered as to the issue they wished to discuss. Trimble invited them to talk, either where they were, or in the chapel chairman's office. Fowler declined and insisted they all go outside. Trimble refused to go outside, so Fowler assured him "I'll see you when you get off work."

Trimble was understandably frightened by this encounter. He had been confronted by two men he knew to have histories of job-related violence, and a third man he had never seen before. These men had refused his invitation to talk in the shop or in a quieter office and, without explanation, had demanded that he step outside. When he declined, he was informed that he would be met in the early morning when his shift ended. The two impartial eyewitnesses both stated that Fowler used a threatening tone of voice. The implications raised by an invitation to step outside, delivered in a threatening tone, are clear.

When his shift ended, Trimble was not enamored with the prospect of standing around in the dark, waiting for his bus. He requested that a security guard accompany him to the bus stop. The employer became aware of the confrontation through Trimble's request for a guard and, knowing of past incidents of violence involving Tenorio and Fowler, discharged them.

The union here was faced with strong evidence against the grievants and with an employer that was unyielding in its desire to enforce the discharge. While it is not appropriate for the court to evaluate the merits of the grievance, *Vaca v. Sipes*, 386 U.S. at 192–93, 87 S.Ct. at 917–918, we may look at the existence and weight of the available evidence to decide if the union's handling of the case was arbitrary or perfunctory. *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1215 (9th Cir. 1980).

The Board decided that this situation was not so ambiguous as to require statements from Tenorio and Fowler. In my view, the judgment represents a "reasonably defensible" interpretation of the NLRA. *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. at 1849.

Even if the union had interviewed Tenorio and Fowler, it is extremely doubtful that their version of the incident would have been given any weight by the employer or would have altered the union's conclusion that the grievance was meritless. In fact, the ALJ found their testimony to be contradictory and unreliable, and accorded it no weight. Thus, to transmute this situation to the context of a judicial proceeding, even if the union's conduct in representing Tenorio and Fowler were "error," I would find it "harmless error."

In addition to its responsibility to protect the rights of aggrieved members, the union has a duty to its membership as a whole to expend its resources wisely. Here, the union's president interviewed Trimble and two eyewitnesses to the confrontation, and determined that it was a bad case requiring no further investigation. In making that decision, he was responding to his responsibility to the entire membership not to waste additional time on what he had determined was a meritless grievance. *See Fountain v. Safeway Stores, Inc.*, 555 F.2d 753, 756–57 (9th Cir. 1977).

In short, the Board has special expertise in the labor field and is in the best position to evaluate the reasonableness of a union's representation in the context of normal labor relations. It is clear that even though the union did not interview Tenorio and Fowler, it did more than a perfunctory job. It made a rather thorough investigation. There was ample evidence for the Board to conclude that the union's failure to interview the two, in the circumstances presented here, was not so egregious as to violate the union's duty of fair representation.