97 F.3d 1460
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Brett PAPELL, Leonard Williams, Plaintiffs-Appellants,
v.
LOOMIS ARMORED, INC., a corporation; Retail Delivery
Drivers, Local Union 278, International
Brotherhood of Teamsters, a labor
organization, Defendants-Appellees
 No. 95-15704.
 United States Court of Appeals, Ninth Circuit.
 Submitted Aug. 16, 1996.*
Decided Sept. 23, 1996.
 
 Before: SNEED, NOONAN, and THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Brett Papell and Leonard Williams challenge an adverse grant of summary judgment in their action against their former employer, Loomis Armored, Inc. ("Loomis"), and their union, Retail Delivery Drivers, Local Union 278, International Brotherhood of Teamsters ("Union"). They argue that the district court erred in concluding that the Union did not breach its duty of fair representation, with the result that appellants cannot state a claim for wrongful termination, and that their defamation claim was preempted by section 301 of the Labor Management Relations Act ("LMRA"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 I.
 FACTS & PROCEEDINGS BELOW
 
 3
 Brett Papell and Leonard Williams were employed by Loomis as armored car drivers/custodians and were covered by a collective bargaining agreement ("CBA") between Loomis and the Union. The CBA provides both that no employee may be discharged without just cause, and that employees may be discharged without prior warning for gross misconduct during working hours. It also sets out a mandatory procedure for bringing grievances against Loomis.
 
 
 4
 On the evening of December 2, 1992, Papell and Loomis were the driver and custodian, respectively, of Loomis armored truck # 1643, transporting several hundred thousand dollars from the Loomis branch in Oakland to its facility in San Francisco. Although Papell was required by company policy to complete a daily inspection report concerning the vehicle, he did not do so that day.
 
 
 5
 That day, however, was an eventful one. While Papell and Williams were driving toward the freeway on 32nd Street in Oakland, a station wagon driving in front of them failed to stop at several intersections, then abruptly stopped at a stop sign for 7-8 seconds. After Papell honked, the car moved on, and truck # 1643 proceeded onto the freeway and over the Bay Bridge. After they exited the freeway in San Francisco, they were proceeding along the Embarcadero toward the Loomis facility when the driver of a white Datsun B-210 next to them honked and gestured repeatedly toward the back of their truck. Papell and Williams evidenced no immediate response to either of these incidents. When they arrived at the Loomis facility, Papell and Williams found that the lock was missing from the back door of the truck and that $341,000 was missing from their cargo. They then reported the unusual incidents experienced en route to their supervisor.
 
 
 6
 A subsequent investigation revealed the following. While the station wagon blocked the Loomis truck for 7-8 seconds, a former Loomis employee with a key to the truck entered the rear cargo area and began loading money into a duffel bag. When the truck reached the Embarcadero, the thief jumped out and was transported by an accomplice back to Oakland. The driver of the Datsun apparently had attempted to alert them to the theft.
 
 
 7
 In its pertinent part, the Loomis Employee Handbook, which the parties agree governs appellants' employment, instructs drivers and custodians thus:
 
 
 8
 Be on the alert for suspicious looking cars and/or persons. Whenever you observe a person who you feel is acting suspiciously, perhaps you have seen him/her at several stops or someone is studying your operation by following your vehicle, NOTIFY YOUR CREW PARTNER AND YOUR SUPERVISOR.... Carefully note physical descriptions of the suspicious person(s) and their vehicle, including the vehicle's make, color, and license number.
 
 
 9
 Also be on the alert for a trick to gain entry to our premises or vehicles.
 
 
 10
 Papell and Loomis did not jot down either a description of the station wagon or its license number, or the license number of the Datsun. Although they had a radio, they did not attempt to radio Oakland to alert them to the suspicious incidents. Indeed, both claim that the events did not arouse their suspicions.
 
 
 11
 Loomis immediately suspended Papell and Williams while it investigated the incident, then on December 11 terminated them for "gross misconduct." In accordance with the procedures set out in the CBA, the Union filed a grievance on appellants' behalf, stating that Loomis lacked just cause to discharge them. When Loomis denied the grievance, the Union appealed the decision to an Adjustment Board.
 
 
 12
 Union business agent Fred Englehart, to be assisted by Terry McHugh, was assigned to investigate the grievance and to represent Papell and Williams before the Adjustment Board. Englehart investigated appellants' complaints about the deficiencies of truck # 1643, confirming their claims that its lock was inadequate, its rear seat was broken, its alarm system did not function, and its engine was excessively noisy. Englehart also examined the daily inspection reports available for the truck, but found none completed by either Williams or Papell that documented these deficiencies.
 
 
 13
 In his investigation, Englehart did not interview the other drivers/custodians suggested by Papell and Williams as witnesses. Nor did he investigate a criminal complaint subsequently filed against two men charged with aiding and abetting the former Loomis employee who committed the theft.
 
 
 14
 At the Adjustment Board hearing on September 14, Englehart sought to place the fault on Loomis by arguing that truck # 1643 was so deficient that the robbery could have occurred though appellants were alert. Loomis, while conceding the truck's deficiencies and its own role in allowing them to go unmended, argued that Williams and Papell should have been even more alert as a result and that the unusual incidents should have invoked some immediate response. Williams and Papell also made statements at the hearing.
 
 
 15
 When the hearing concluded, appellants both stated in response to questioning that they were satisfied with the fairness of the proceeding and with the Union's representation. Indeed, both stated at deposition that when they left the hearing, they felt Englehart had given "a very good defense," and that they had won. They were wrong about the latter; the Board of Adjustment unanimously found there was just cause for appellants' termination, and upheld Loomis's decision.
 
 
 16
 Papell and Williams then filed this action against Loomis and the Union in Alameda County Superior Court. The Union removed the case to the District Court for the Northern District of California under 29 U.S.C. § 185(a). The district court subsequently granted the Union's and Loomis's motions for summary judgment, and Papell and Williams timely appealed.
 
 II.
 DISCUSSION
 
 17
 We review the district court's grant of summary judgment de novo, making all reasonable inferences in favor of Papell and Williams to determine, first, whether there are any genuine issues of material fact and, second, whether the district court correctly applied the relevant law. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 116 S.Ct. 1261 (1996). Whether a Union's conduct amounted to a breach of the duty of fair representation is a mixed question of fact and law also subject to de novo review. Peters v. Burlington Northern R.R. Co., 931 F.2d 534, 538 (9th Cir.1990). The district court's preemption determination is likewise reviewed de novo. Maynard v. City of San Jose, 37 F.3d 1396, 1405 (9th Cir.1994).
 
 A. The Duty of Fair Representation Claim
 
 18
 1. The Legal Standard.
 
 
 19
 A Union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967); Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270, 1272 (9th Cir.1983). In deciding whether the Union fulfilled its duty, the issue is not whether we find the employees' grievance meritorious, but whether the Union pursued the claim in good faith. Vaca, 386 U.S. at 193.
 
 
 20
 In this context, the good faith standard is somewhat subtle. Mere negligence on the part of the Union is not enough to prove a breach of its duty, but neither is an evil motive or hostility required. Peters, 931 F.2d at 538; Robesky v. Qantas Empire Airways Ltd., 573 F.2d 1082, 1086 (9th Cir.1978). Rather, a Union's decision must be arbitrary, a phrase defined "variously as unintentional conduct showing an egregious disregard for the rights of union members, or even a reckless disregard of such rights; conduct without a rational basis; and omissions that are egregious, unfair and unrelated to legitimate union interests." Peters, 931 F.2d at 538 (internal quotations omitted).
 
 
 21
 A breach of the Union's duty is generally found where it is clear "that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct." Peterson v. Kennedy, 771 F.2d 1244, 1254 (9th Cir.1985), cert. denied, 475 U.S. 1122 (1987). As we have stated:
 
 
 22
 We have never held that a union has acted in an arbitrary manner where the challenged conduct involved the union's judgment as to how best to handle a grievance.... It is for the union, not the courts, to decide whether and in what manner a particular grievance should be pursued.
 
 
 23
 Id.
 
 
 24
 Appellants argue that the district court incorrectly interpreted this standard by stating in its summary judgment order that "a breach requires a conscious decision to largely or totally ignore one's obligations, and Englehart's conduct did not fit that description." Although the district court's choice of words was infelicitous, since a breach does not require a "conscious decision," the court did properly analyze and dispose of appellants' specific claims, to which we now turn.
 
 
 25
 2. Appellants' Arguments.
 
 
 26
 Papell and Williams argue that a reasonable jury could have found the Union's representation inadequate due to Englehart's failure to present key arguments and evidence that would have exculpated them on Loomis's charge of gross misconduct.[1] Specifically, they cite (a) Englehart's failure to present an argument based on the Employee Handbook's definition of "misconduct"; (b) his failure to interview witnesses concerning the deficiencies of truck # 1643; and (c) his failure to investigate the criminal complaint and introduce it at the hearing.
 
 
 27
 a. The Employee Handbook Definition of "Misconduct."
 
 
 28
 Papell and Williams were discharged for "gross misconduct," which is not defined in the CBA; however, the Employee Handbook regards "misconduct" as "deliberate disregard of Company rules and regulations, or repetitious negligence in following them." Appellants, seizing on this definition, contend that Englehart should have argued that, based on this definition, they could not have committed gross misconduct because they did not deliberately disregard company rules. This omission, they argue, is so glaring as to amount to a ministerial failure rather than a tactical error.
 
 
 29
 The Union's response is that it did not make this argument "because (1) the Employee Handbook was not controlling [because it was drafted unilaterally by Loomis]; (2) relying upon the Handbook to define the agreement could set a precedent prejudicial to the interests of Union members as a whole; and (3) the argument probably would have failed." The third reason represents Englehart's judgment that emphasis on the Handbook would hurt appellants' case because of evidence, including Papell's and Williams' own statements, that on December 2 they disregarded several policies and rules contained in the Handbook.
 
 
 30
 We find this response quite adequate. As this court has stated:
 
 
 31
 If a union provides an explanation for having ignored a particularly strong argument during a grievance procedure that is based on reasoning, we will not question whether the reasoning was faulty or not.... But we must be able to determine whether the union deliberated the issue in the first place.
 
 
 32
 Peters, 931 F.2d at 540. Moreover, "a union's conduct may not be deemed arbitrary simply because of an error ... in presenting the grievance at an arbitration hearing." Peterson, 771 F.2d at 1254. See also Conkle v. Jeong, 73 F.3d 909, 915-16 (9th Cir.1995) ("A union representative is entitled to decline to put forward an interpretation of the collective bargaining agreement which he and his union reasonably believe is incorrect") (internal quotations omitted), petition for cert. filed, 64 U.S.L.W. 3780 (U.S. May 6, 1996) (No. 95-1810). Because Englehart did make a deliberate and rational decision not to rely on the Handbook, appellants' argument is unpersuasive.
 
 
 33
 b. Englehart's Failure to Interview Witnesses.
 
 
 34
 Papell and Williams also argue that Englehart did not exercise the special care required in handling their discharge grievance, Tenorio, 680 F.2d at 602, because he presented no testimony by other Loomis drivers that truck # 1643 was so deficient that the robbery could occur despite the fact that Papell and Williams were alert. The Union responds that the testimony was unnecessary and cumulative because the truck's deficiencies were not in dispute. Moreover, these witnesses might have presented testimony harmful to appellants' case, a risk that Englehart felt was unwise and unnecessary. Again, we decline to second-guess this reasoned judgment. See Peterson, 771 F.2d at 1254.
 
 
 35
 c. The Criminal Complaint.
 
 
 36
 Finally, appellants argue that Englehart's failure to present the criminal complaint at the hearing was arbitrary because there was no deliberate decision involved, given that Englehart never saw the complaint until he was deposed in this lawsuit. See Peters, 931 F.2d at 540 ("But we must be able to determine whether the union deliberated the issue in the first place").
 
 
 37
 The Union responds that Englehart declined to present evidence concerning the criminal complaint because it was irrelevant inasmuch as appellants were not charged with assisting the thief or with any other criminal conduct. We accept this rational explanation of the Union's tactical decision.[2]
 
 
 38
 Because appellants' claims fail to illuminate a genuine issue as to the adequacy of the Union's representation, we affirm the grant of summary judgment on this claim.
 
 B. The Wrongful Termination Claim
 
 39
 When a collective bargaining agreement provides that arbitration is the exclusive remedy for employee grievances, an employee may not bring an action against the employer unless the employee can show that the union breached its duty of fair representation. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567-68 (1976); Scott v. Machinists Automotive Trades Dist. Lodge No. 190 of Northern California, 827 F.2d 589, 592 (9th Cir.1987). Article XII of the CBA between Loomis and the Union does contain such a provision. Therefore, we affirm the district court's determination that appellants' wrongful termination claim was not viable because their duty of representation claim did not survive summary judgment.
 
 C. The Defamation Claim
 
 40
 Appellants' defamation claim against Loomis was based on the termination letters stating that appellants' committed gross misconduct on December 2. Papell and Williams alleged that they were compelled to republish these defamatory statements in applications for employment and unemployment compensation benefits. They now argue that the district court erred in treating this claim as preempted by section 301 of the LMRA.
 
 
 41
 Whether a state law claim is preempted by section 301 of the LMRA, 29 U.S.C. § 185, depends upon "whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985). In Scott, 827 F.2d at 594, this court held that an employee's defamation claim against his former employer was preempted because it was "based on facts inextricably intertwined with the grievance machinery of the collective bargaining agreement." Here, Loomis's decision to discharge appellants for gross misconduct was made pursuant to Article III of the CBA. The termination letters were therefore "inextricably intertwined" with the grievance procedures set out in the CBA. The fact that the term "gross misconduct" is not defined in the CBA, as appellants point out, is not determinative.
 
 
 42
 Tellez v. PG & E Co., 817 F.2d 536 (9th Cir.), cert. denied, 484 U.S. 908 (1987), on which appellants rely, does not require a different result. There, Tellez's defamation claim was based on PG & E's distribution to several company managers of a suspension letter falsely accusing Tellez of buying cocaine on the job. As the court observed, "[t]his claim neither asserts rights deriving from the collective bargaining agreement, nor requires interpretation of the agreement's terms." Id. at 538. Here, by contrast, Loomis's letter explained that the basis for the discharge was appellants' "gross misconduct," a legitimate basis under the terms of the CBA. As was true in Scott, 827 F.2d at 594, "the statements here were made within the context of a formal grievance procedure." Therefore, the district court correctly held that appellants' defamation claim was preempted.
 
 
 43
 AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to 9th Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Appellants also argue that the district court incorrectly decided a contested issue of fact by determining that Englehart argued their case adequately, and that the Union therefore did not breach its duty. They contend that Englehart's purported statement at his first meeting with appellants that "I can't believe this could have happened without your knowledge" raises a genuine issue as to the material fact of the adequacy of Englehart's representation. This argument is flawed for two reasons: first, the adequacy of representation is a mixed question of law and fact that is appropriately decided at summary judgment where the underlying facts are undisputed. Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir.), cert. denied, 115 S.Ct. 428 (1994). Second, even accepting as undisputed that Englehart made this statement, it does not raise a genuine issue as to the adequacy of his representation so long as his subsequent investigation and presentation of the claim was adequate. Tenorio v. N.L.R.B., 680 F.2d 598 (9th Cir.1982), on which appellants rely, is not to the contrary. There, the Union violated its own policy of obtaining the employees' side of the story before processing their grievance, and immediately issued them "travel cards," which were given to employees planning to leave the area and "preclude[d] the holder from further dispatch by the issuing union chapter." Id. at 600 n. 3. The Union subsequently agreed to settle the grievance rather than take it to arbitration. Based on those facts, the Tenorio court held that "the Union handled petitioners' grievance arbitrarily and perfunctorily.... [T]he fact that the Union promptly issued travel cards to petitioners suggests that it intended to handle their grievance in a summary manner. This action showed that the Union had accepted Trimble's version of what had happened without even attempting to hear petitioners' story." Id. at 602. Here, even inferring that Englehart's statement showed his intention to handle appellants' claim perfunctorily, subsequent events revealed that he did not follow through on that intention
 
 
 [2]
 It is true that Englehart did not make a deliberate decision not to present the criminal complaint itself at the hearing, since he had not seen it then. However, he did consider whether to present a newspaper article reporting the criminal charges which appellants showed him on the morning of the hearing. Englehart explained at the time that the article was irrelevant because "the company was not accusing them of stealing the money. It was obvious that someone else besides the two of them had stolen the money, and that ... their terminations were for the inattention of allowing that to happen to the truck."