Harold B. BARNES, Plaintiff,

v.

LINE DRIVERS, LOCAL PICKUP AND DELIVERY LOCAL 81, and Consolidated Freightways Corporation of Delaware, a foreign corporation, Defendants.

No. CIV–00–578–HU.

United States District Court,
D. Oregon.

March 21, 2001.

---

George P. Fisher, George P. Fisher, Attorney at Law, Portland, OR, for Plaintiff.

Paul C. Hays, Carney, Buckley & Hays, Portland, OR, for Defendant Line Drivers, Local Pickup and Delivery, Local 81.

Kathy Peck, Cynthia Halse Stutsman, Williams, Zografos & Peck, Lake Oswego, OR, for Defendant Consolidated Freightways Corporation of Delaware.

## OPINION & ORDER

HUBEL, United States Magistrate Judge.

Plaintiff Harold Barnes brings this combined breach of the duty of fair representation and breach of contract action against his former employer defendant Consolidated Freightways Corporation (CFC), and his union, defendant Line Drivers, Local Pickup and Delivery, Local 81 ("the Union"). In his Complaint, plaintiff contends that the Union breached its duty of fair representation when it failed to pursue plaintiff's grievance. Compl. at ¶ 5.2 He further contends that CFC breached the collective bargaining agreement (CBA) between it and the Union when it terminated plaintiff. *Id.* at ¶ 6.2

Defendants jointly move for summary judgment. I grant the motion.

## BACKGROUND

From the record, the following facts appear. Plaintiff worked for CFC out of

Cheyenne, Wyoming or Portland, Oregon from 1984 until September 15, 1999. Before September 15, 1999, plaintiff's relationship with the Union was satisfactory. He experienced no animosity or bad feelings from the Union's agents, employees, or officers.

On September 14, 1999, plaintiff drove for CFC from Eugene to Portland, finishing his shift about 5:00 p.m. That evening, he and a co-worker drank beer at two different locations. Plaintiff does not know how many beers he drank at the second tavern he visited but believes he drank three or four beers at the first tavern. Plaintiff knew that he was subject to a work call from CFC the following morning.

As expected, plaintiff received a wake-up call from CFC's dispatcher at 7:00 a.m. on September 15, 1999. Because he fell back asleep after the call, he did not shower before he reported to work. Shortly after arriving at work, Greg Reisnaur, driver supervisor for CFC, told plaintiff that plaintiff needed to report for a probable suspicion drug and alcohol test.

Plaintiff was transported by managerial employees Reisnaur and Marty Hope to Concentra, CFC's drug and alcohol testing facility. The Union's business agent, Gary McMerrick, was contacted and agreed to meet plaintiff at Concentra.

When McMerrick arrived, plaintiff told him that he had been drinking the previous night. McMerrick explained that plaintiff had to submit to testing because refusing to do so would be considered a dischargeable event.

Plaintiff provided a urine sample to the lab technician at Concentra. The lab technician determined that the sample was outside of the appropriate temperature range. She threw away the sample. At that point, Reisnaur told plaintiff and McMerrick that CFC considered an out-of-temperature urine sample to be an adulterated specimen, a basis for discharge. Consequently, he told plaintiff that he could resign or Reisnaur would fire him.

McMerrick then called Harold MacKenzie at the Union to discuss if, in fact, an out-of-temperature urine specimen was considered an adulterated specimen within the meaning of the CBA. After McMerrick spoke with MacKenzie, McMerrick was unable to tell plaintiff conclusively one way or the other, whether plaintiff's out-of-temperature urine sample was deemed an adulterated test within the meaning of the CBA. McMerrick left the resignation decision up to plaintiff. After conferring with McMerrick, plaintiff resigned.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.' " *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts

showing an issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Id.; In re Agricultural Research and Tech. Group*, 916 F.2d 528, 534 (9th Cir.1990); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

## DISCUSSION

An employee's breach of employment contract action against his employer arising out of a union's failure to perform its duty of fair representation under the terms of a CBA, is a "hybrid" action under 29 U.S.C. § 185(a) and has a six-month statute of limitations period. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

> A "hybrid" suit is potentially two suits—a suit against the employer for breach of the collective bargaining agreement under section 301 [of the Labor Management Relations Act] and a suit against the union for breach of the duty of fair representation under the [National Labor Relations Act]. These two claims are inextricably interdependent; the plaintiff must prove the same elements whether he or she chooses to sue one or both of the potential defendants. *DelCostello*, 462 U.S. at 164–65, 103 S.Ct. at 2290–91.

*Moore v. Local Union 569 of the Int'l Bhd. of Elec. Workers*, 989 F.2d 1534, 1541 (9th Cir.1993).

■ To succeed on the claim against CFC, plaintiff must succeed on the duty of fair representation (DFR) claim against the Union. *See Slevira v. Western Sugar Co.*, 200 F.3d 1218, 1221 (9th Cir.2000) (parties agreed that plaintiff's action against former employer could succeed only if the union breached its duty of fair representation); *see also Conkle v. Jeong*, 73 F.3d 909, 916–17 (9th Cir.1995) (to proceed with a section 301 suit against the employer, the employee must show not only that her discharge was contrary to the CBA, but also must demonstrate that the union breached its DFR; because the union did not breach its DFR, plaintiff could not pursue her section 301 claim against the employer); *Stevens v. Moore Bus. Forms, Inc.*, 18 F.3d 1443, 1444 (9th Cir.1994) (union's liability in a DFR claim is a condition precedent to plaintiff prevailing on a section 301 claim against the employer).

■ The Ninth Circuit uses a two-step analysis to determine if a union has breached its DFR:

> First, we must decide whether the alleged union misconduct involved the union's judgment, or whether it was procedural or ministerial. Second, if the conduct was procedural or ministerial, then the plaintiff may prevail if the union's conduct was arbitrary, discriminatory, or in bad faith. However, if the conduct involved the union's judgment, then the plaintiff may prevail only if the union's conduct was discriminatory or in bad faith.

*Wellman v. Writers Guild of Am. West, Inc.,* 146 F.3d 666, 670 (9th Cir.1998).

## I. Statute of Limitations

■ Defendants argue that plaintiff filed this action outside of the six-month limitations period. The limitations period begins to run "when the employee discovers or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Galindo v. Stoody Co.,* 793 F.2d 1502, 1509 (9th Cir.1986) (internal quotation omitted). Where the facts are not in dispute, the date of accrual of a statute of limitations is a question of law. *Id.* at 1508.

Plaintiff filed the Complaint on April 28, 2000. If he knew, or should have known, about any wrongdoing by the Union before October 28, 1999, then his claim is barred by the statute of limitations. "A reasoned analysis of the question when a duty of fair representation claim accrues must focus on the context in which the claim arose." *Id.* at 1509.

■ In paragraph 5.2 of his Complaint, plaintiff alleges that "Local 81 has a duty to fairly represent each member of the union. Local 81 breached this duty when it failed to pursue Barnes' grievance." Compl. at ¶ 5.2. Plaintiff also alleges that "[o]n or about September 1999, [he] filed a grievance concerning his termination." Compl. at ¶ 4.3. Evidence submitted by plaintiff in opposition to the summary judgment motion shows that the grievance was dated September 29, 1999. Attchmts 1 and 2 to Barnes Affid. In the grievance, plaintiff indicates that Articles 35, 45, and 46 of the CBA were implicated. *Id.* In the letter submitted with the grievance form, plaintiff claimed that his resignation was improper because he was under the influence of alcohol and because of coercion and misrepresentation by the employer. Attchmt 2 to Barnes Affid.; *see also* Pltf's Exh. E (September 29, 1999 letter from MacKenzie to plaintiff indicating grievance filed that date and suggesting possible problems with the grievance due to plaintiff's resignation).

On October 29, 1999, CFC sent Mac-Kenzie a letter in response to the grievance. Attchmt 3 to Barnes Affid. There, the employer indicated that because this was a resignation, the Joint State Committee would be the better forum for adjudicating the grievance. *Id.* In his affidavit, Barnes states that during a Committee meeting in early November 1999, his case came up on the Committee's agenda and he was told that the Committee was dropping his case for lack of jurisdiction. Barnes Affid. at ¶ 7. The Union then indicated that there was nothing more it could do for him. *Id.*

Based on this undisputed evidence, if the basis of plaintiff's DFR claim is the Union's failure to properly process the grievance, the claim is timely because plaintiff did not know, and could not have known, until he learned in early November 1999, that the Union was not going to continue to prosecute his grievance. Thus, his April 28, 2000 Complaint is timely for such a claim.

Defendants argue, however, that in responses to discovery requests and in his deposition, plaintiff has restricted his DFR claim to events occurring on September 15, 1999, the day he resigned, and thus, his claim accrued on that date and is untimely.

Defendants first point to the following question and response contained in plaintiff's response to CFC's First Request for Interrogatories:

State what conduct Local [81] engaged in, or failed to engage in, which breached its duty of fair representation, when it failed to pursue Barnes' grievance alleged in paragraph 5.2.

Defendant Local [81] permitted numerous violations of Article 35 section 3 of the collective bargaining agreement.

Exh. D to Stutsman Affid. at pp. 2–3. During plaintiff's September 14, 2000 deposition, plaintiff's counsel amended that response to include both Sections 3 and 4 of Article 35 of the CBA. Exh. A to Stutsman Affid. at p. 80. Article 35, Section 3 of the CBA governs drug testing while Article 35, Section 4 of the CBA governs alcohol testing.

In addition, plaintiff gave the following testimony at deposition:

Q: . . . tell me what you think Local 81 did wrong on September 15 at the Concentra place.

A: Well, without reading I don't know all of the things that were wrong. Ultimately, of course, we lost the grievance, and it was because it was improperly presented to the Joint Western Council.

Q: Well, in your interrogatory you indicated that the union failed to represent you concerning the drug testing materials. So was there anything that was done wrong at the drug testing facility—

A: To my knowledge—

Q: —by Local 81? Excuse me, by Local 81?

A: Just a lack of information.

    \*    \*    \*    \*    \*    \*

Q: . . . Other than your characterization of Mr. McMerrick at the drug testing facility not having sufficient information, was there anything else that happened at the drug testing facility on September 15, 1999, that you believe constitutes a failure to represent you by Teamsters Local 81 or its representatives?

A: I think I should have been informed of the rights I had under these—under the contract. And when we called Mr. McKenzie at Local 81—when McMerrick did, that we still had no answer.

    \*    \*    \*    \*    \*    \*

Q: . . . And anything else that you know of that Teamsters 81 or its representatives did or failed to do that constitutes failure to represent you in your employment?

A: Not right offhand, no.

Q: At this point the only thing you can identify for us was that there was a lack of information at the time that Mr. Reisnaur told you either resign or he would fire you?

A: Yes.

Exh. A to Stutsman Affid. at pp. 80–84.

Based on the interrogatory response and the deposition testimony, defendants argue that the undisputed facts show that the only basis for plaintiff's DFR claim is the lack of information at the time Reisnaur stated that plaintiff would be discharged for having an adulterated urine sample. Because, defendants argue, this alleged breach occurred and was completed on September 15, 1999, and the Complaint was not filed until April 28, 2000, more than seven months later, the claim is untimely.

I disagree with defendants. From the testimony and the interrogatory response, plaintiff indicates that violations of Sections 3 and 4 of Article 35 occurred on September 15, 1999, that these violations resulted in an unjustified threat of termination, and that the threatened termination then caused his coerced resignation. Considering these allegations with the Complaint, plaintiff then bases his DFR claim on the Union's failure to "properly present" and process his grievance, which plaintiff believes had merit because of the events of September 15, 1999. Thus, I do not read plaintiff's interrogatory response and deposition testimony as restricting the basis of his DFR claim solely to the events of September 15, 1999.[1]

---

1. I also note that in the quoted deposition testimony, most of the questions were point-

Even if I read the interrogatory response and deposition testimony as defendants do, however, I still reject their argument. Defendants argue that plaintiff's attempt to change the basis of his claim from grievance processing to the events of September 15, 1999, is tantamount to amending a complaint while summary judgment is pending, after the close of discovery, which defendants maintain should not be allowed.

I do not see plaintiff's actions that way. Plaintiff does not need to amend his Complaint here. Instead, this might be seen as an attempt by plaintiff to interpret his deposition testimony and the sworn response to the interrogatory inconsistently with their plain meaning in the face of a summary judgment motion, much like the situation where a party or witness attempts to change deposition testimony with a subsequent affidavit. *See, e.g.,* *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266–67 (9th Cir.1991) ("sham" affidavit contradicting prior deposition testimony and used to create material issue of fact to preclude summary judgment, not allowed). Here, however, the interpretation plaintiff applies to the deposition testimony in opposition to summary judgment, is not a sham contradiction of those sworn responses. The questions did not elicit sufficiently concrete answers.

Thus, it is appropriate to construe the Complaint, the interrogatory response, and the deposition testimony as establishing two bases for the DFR claim: the events that occurred on September 15, 1999, and the Union's failure to process a grievance on plaintiff's behalf based on the September 15, 1999 events. As explained above, the claim regarding the Union's failure to

process the grievance is timely. To the extent plaintiff bases the claim on the events of September 15, 1999, unrelated to the grievance processing, the claim is barred because it was filed more than six months after September 15, 1999. Thus, what remains is plaintiff's claim that the Union breached its DFR by failing to properly process plaintiff's grievance.

## II. Merits

As indicated above, the first part of the analysis is a determination of whether the Union's actions were procedural or ministerial, or whether they involved the Union's judgment. As explained by the Ninth Circuit in *Wellman:*

> Union actions that are commanded or prohibited by union rules or policies involve little or no discretion and generally are ministerial in nature. *See, e.g.,* *Stevens v. Moore Business Forms, Inc.,* 18 F.3d 1443, 1448 (9th Cir.1994) (citing the timely filing of a meritorious grievance as an example of ministerial conduct); *Moore v. Bechtel Power Corp.,* 840 F.2d 634, 637 (9th Cir.1988) (holding that a union's failure to provide adequate notice of grievance meetings, its failure to abide by time limits at meetings, and its tardy announcement of its decision were ministerial conduct); *Dutrisac v. Caterpillar Tractor Co.,* 749 F.2d 1270, 1274 (9th Cir.1983) (holding that a union's failure to perform the "mechanical function" of attending to deadlines is ministerial conduct). On the other hand, when a union is confronted with more subjective issues about which the collective bargaining agreement or union policies are silent, and which are sufficiently novel that no

edly focused on the events of September 15, 1999, and what plaintiff thought the Union did wrong on that date. Given the focus of the questions, I do not give much weight to plaintiff's responses to the last two quoted

deposition questions in which plaintiff states that he knows of nothing else that the Union did wrong. Plaintiff could easily have understood those questions to be addressed only to the events of September 15, 1999.

practices have developed to cope with them, we are more likely to find a union's judgment at work. *See Moore*, 840 F.2d at 637 (holding that a union's consistent construction of its collective bargaining agreement adversely to the union member was a matter of judgment).

A union's decision not to arbitrate a grievance that it considers to be meritless is an exercise of its judgment. *Stevens*, 18 F.3d at 1447. And, in general, a union's decision about how best to handle a grievance also is a matter of its judgment. *Peterson v. Kennedy*, 771 F.2d 1244, 1254 (9th Cir.1985). But to be sure that the union is employing some principled way of screening the meritorious grievances from the meritless ones, we have held that "a union must conduct some minimal investigation of grievances brought to its attention." *Tenorio v. NLRB*, 680 F.2d 598, 601 (9th Cir.1982). Consequently, when a union member brings a meritorious grievance, the union's decision to ignore that grievance or to process it in a perfunctory manner is a ministerial action that we will overturn if it is arbitrary, discriminatory, or performed in bad faith. *Peters*, 931 F.2d at 539–40. But we will not find that the union has exercised its duties perfunctorily unless it has treated the union member's claim so lightly as to suggest an "egregious disregard" of her rights. *Stevens*, 18 F.3d at 1448 (citing *Tenorio*, 680 F.2d at 601). *Wellman*, 146 F.3d at 670. Pursuant to the analysis, if plaintiff's grievance lacked merit, the Union's decision not to prosecute it after its initial filing is an exercise of judgment, entitling plaintiff to prevail only if the Union's conduct was discriminatory or in bad faith. Alternatively, if there is evidence that the grievance had merit, the Union's decision not to prosecute can still be a matter of judgment, but only if there is no evidence that the Union ignored it or processed it in a perfunctory

manner, in which case plaintiff will prevail upon arbitrary action by the Union. Accordingly, the inquiry must focus on whether plaintiff's grievance was meritorious.

██ In his written materials, plaintiff argued that his grievance had merit based on five alleged violations of Sections 3 and 4 of Article 35 of the CBA. During oral argument, he conceded that two of those were untenable. I will address each of the remaining allegations in turn.

Plaintiff argues that the grievance had merit because when he was unable to produce a minimal amount of urine for sampling, he was not examined by a licensed physician to determine whether there was a physiological reason for his inability to do so. He contends that the CBA provides that if, after being given forty ounces of liquid, the employee still cannot produce a forty-five milliliter sample, the employee shall be evaluated by a physician. *See* Exh. E to Stutsman Affid. at p. 116–17 (CBA, Art. 35, § 3A).

However, as defendants note, the evidence is not that the sample was too small, but that it was out-of-temperature. *See* Exh. F to Supp'l Stutsman Affid. at pp. 69–70 (plaintiff testifies in deposition that when he handed the lab technician the urine sample and told her he was not sure if there was enough, she looked at it and said she thought it was enough, but then, after discussions with another technician, determined it was not in temperature range). Thus, it appears that this section of the CBA was not violated and a grievance based on an alleged violation of this provision would be without merit. To the extent the grievance was based on a violation of this provision, the Union's failure to process the grievance was an exercise of judgment.

At oral argument, plaintiff stated that after the lab technician threw away the

out-of-temperature sample, he was told to produce another one. Unable to do so immediately, he began to drink water. He stated that during the time everyone was waiting for him to produce another sample, Reisnaur told him that he could resign or be fired. This, he contends, violated Article 35, Section 3A of the CBA, guaranteeing evaluation by a physician.

The record shows that when the lab technician threw away the out-of-temperature sample, she then asked plaintiff to produce another one and at that point, he was given some water to drink. Exh. F to Supp'l Stutsman Affid. at p. 2. There is no evidence in the record, however, to support plaintiff's statements that after drinking the water, he was unable to produce another sample or that while waiting for him to do so, Reisnaur issued his ultimatum. Thus, the record provides no basis factual for me to consider plaintiff's argument.

Additionally, even considering plaintiff's statements and his counsel's argument, he never indicated that he was unable to produce a second sample after drinking the water. The CBA requires a physician evaluation only when an employee has been given forty ounces of water and is unable to produce a sample within three hours. Here, according to plaintiff's unsubstantiated statements, he resigned while waiting to produce another sample. Thus, the situation never got to the point where it was determined that plaintiff was unable to produce a second sample. Therefore, a grievance based on these facts would not have been meritorious.

Next, plaintiff argues that the CBA was violated when the urine sample was not preserved, but destroyed. Article 35, Section 3F2 provides that "[a]ll specimens 'deemed' positive by the laboratory, according to the prescribed guidelines, must be retained at the laboratory for a period of one (1) year." Exh. E to Stutsman Affid. at p. 121 (CBA, Art. 35, § 3F2).

The CBA provides that employees who intentionally tamper with or substitute a specimen are treated as if their specimens tested positive. *Id.* at p. 119–20 (CBA, Art. 35, § 3). As defendants must acknowledge, plaintiff's out-of-temperature urine specimen was thus "deemed" positive because CFC considered it an adulterated sample under this provision, subjecting plaintiff to discharge pursuant to Article 35, Section I of the CBA. *Id.* at p. 124 (CBA, Art. 35, § I).

Nonetheless, I do not consider the failure to retain the sample as a violation of the CBA under these facts. The obvious intent of the CBA is to preserve samples which initially test positive so that they can be retested using a different testing technique. *See id.* at p. 122 (CBA, Art. 35, § G1 requiring all specimens initially testing positive to be retested using gas chromatograph/mass spectrometry techniques). Alternatively, the provision requiring preservation could be intended to allow testing of samples suspected for adulteration, for certain physiological determinations such as creatinine, specific gravity, and/or chloride measurements to conclusively establish adulteration. *See id.* at p. 119–20 (CBA, Art. 35, § D allowing testing for physiologic determinations to deter adulteration).

Practically speaking, there is no purpose in preserving a sample which has been found adulterated because of it being out of temperature. Clearly, the temperature at that time cannot be duplicated upon remeasurement. The temperature determination was made by the laboratory right after plaintiff, who was supposed to have just produced the sample, gave the sample to the technician. Although "deemed" positive because it was out-of-temperature range, it makes no sense to apply the

CBA's preservation provision to such a test result for the sample. Thus, a grievance based on this provision would not have been meritorious and the Union's decision not to process it was an exercise of judgment.

■ Alternatively, if the CBA is interpreted to require preservation of adulterated samples, the grievance could have merit. However, even if the grievance had merit, there is no evidence that the Union treated plaintiff's claim with "egregious disregard" or ignored the grievance, triggering liability based on arbitrary action. Here, the evidence showed that the Union initially filed the grievance on plaintiff's behalf, invited plaintiff to confer with the Union about the grievance, and considered it at a Joint Committee meeting. The problem with prosecuting the grievance, even if it had merit, was that plaintiff had resigned. Thus, given that the Union initially handled the grievance and that its later determination to forego its prosecution was related to the problems created by plaintiff's resignation, the Union's decision not to prosecute it was a matter of judgment, not a procedural or ministerial act.

As a third basis for his claim, plaintiff contends that the grievance had merit because the CBA requires the employer to take steps to detect tampering or substitution and to establish that the employee's specimen had been intentionally tampered with or substituted by the employee. Exh. E to Stutsman Affid. at pp. 119–20 (CBA, Art. 35, § 3D). The evidence shows, however, that while on the way to the testing center with Reisnaur and Hope, plaintiff went into a deli, used the restroom, and was out of Reisnaur's and Hope's sight for a short time. This evidence, combined with the out-of-temperature sample, produced in a manner not requiring observation, is enough to suggest intentional tampering or substitution. The CBA does not

appear to require the employer to conduct a formal investigation into this issue. Thus, a grievance based on this provision would lack merit and the Union's decision not to prosecute the grievance was an exercise of judgment.

One issue which the parties did not address, but which concerned me, is the provision in the CBA which states that "the Employer has the right to request the personnel administering a urine collection to take such steps as checking the color and temperature of the urine specimen ...." *Id.* at p. 119 (CBA, Art. 35, § D). On its face, this provision gives the employer the *right* to request a check of color and temperature. The record failed to reveal any positive evidence of a request being made in this case. Both parties declined to supplement the record in this regard. Defendants contended that the employer, through its agent the laboratory, issues a de facto request to check the color and temperature as a result of it requiring the laboratory to adhere to standard testing protocols. However, defendants offered no evidence to support that contention.

While plaintiff was unwilling to concede that a request was made in this case, plaintiff failed to argue that the CBA was violated by the lack of such a request, even after I raised this issue during oral argument. This failure, combined with defendants' argument which is logical although unsupported, leads me to conclude that any grievance based on the employer's alleged failure to request a color and temperature check, would lack merit. Accordingly, the Union's failure to prosecute the grievance beyond its initial filing was an exercise of judgment.

Having determined that none of the asserted violations of the CBA had merit, or that if they did the Union did not ignore the grievance or act perfunctorily, the

question is whether the Union's acts were in bad faith or discriminatory. Defendants note that plaintiff admitted in deposition that until September 15, 1999, plaintiff had a satisfactory relationship with the Union, that he never felt animosity from the Union or its agents at any time, there was no bad blood, there were no hard feelings, and that plaintiff does not believe that the Union discriminated against him. Exh. A to Stutsman Affid. at pp. 35, 36, 81, 82.

In response, plaintiff presents no evidence of bad faith or discrimination by the Union. Thus, plaintiff fails to create an issue of fact regarding the Union's liability for the exercise of its judgment.

Even if the Union's actions were examined for arbitrariness rather than for bad faith or discriminatory intent, plaintiff's claim fails. As indicated above, from the very beginning the Union was concerned about the impact of plaintiff's resignation. The evidence that the decision to resign was without pressure from the Union and was completely up to plaintiff, is undisputed. Given the problems the resignation posed to the prosecution of even a meritorious grievance, the Union's decision not to continue to process the grievance beyond its initial filing, was not arbitrary. There is no basis for the Union's liability.

Finally, because plaintiff cannot sustain his DFR claim against the Union, his breach of contract claim against CFC also fails.

### CONCLUSION

Defendants' joint motion for summary judgment (# 26) is granted.

IT IS SO ORDERED.